Peter M. Meloy, MT Bar No. 1035
MELOY LAW FIRM
P.O. Box 1241
Helena, MT 59624
Telephone:  406.442.8670
Mike@meloylawfirm.com

Matthew P. Gordon, MT. Bar No. 53468386
Kevin J. Hamilton, *pro hac vice* pending
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:  206.359.8000
Facsimile:   206.359.9000
MGordon@perkinscoie.com
KHamilton@perkinscoie.com

*Attorneys for Proposed Intervenor-*
*Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| ROYAL DAVIS, GARY MARBUT, TOM HARSCH, and TERESA HARSCH,<br><br>                 Plaintiffs,<br><br>    v.<br><br>COREY STAPLETON, in his official capacity as Montana Secretary of State,<br><br>                 Defendant,<br><br>and<br><br>MONTANA DEMOCRATIC PARTY, a Montana domestic nonprofit corporation, RYAN FILZ, MADELINE NEUMEYER, and REBECCA WEED, individual electors,<br><br>                 Proposed Intervenor-Defendants. | Case No. 6:20-cv-00062-DLC<br><br>**PROPOSED INTERVENOR DEFENDANTS' BRIEF IN SUPPORT OF EMERGENCY MOTION TO INTERVENE AS DEFENDANTS** |

**TABLE OF CONTENTS**

Page

MEMORANDUM OF LAW ....................................................................1

I.     INTRODUCTION.................................................................2

II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY...........5

    A.    Out-of-state paid petition gatherers attempted to qualify the Montana Green Party for ballot access—and were denounced by the Montana Green Party....................................5

    B.    Local reporters uncovered the Montana Republican Party's secret financial backing of the Petition, which violated Montana law..................................................8

    C.    After the truth came out, hundreds of signers withdrew their signatures from the Petition.................................9

    D.    The Secretary arbitrarily refused to accept hundreds of withdrawals with no legal grounds for doing so....................11

    E.    The State Court Order enjoined the Secretary of State from including unqualified Green Party Candidates on the general election ballot ........................................13

III.   Argument.......................................................................15

    A.    The Proposed Intervenors are entitled to intervene as a matter of right..............................................................15

        1.    The Motion to Intervene is timely ................................16

        2.    The Proposed Intervenors possess significant, legally cognizable interests in the substance of this litigation.........................................................17

        3.    The disposition of this litigation may impair the Proposed Intervenors' ability to protect their interests ..........................................................20

        4.    Defendant's representation of the interests of the Proposed Intervenors would be inadequate..................21

    B.    In the alternative, the Court should exercise its discretion to grant the Proposed Intervenors permission to intervene under Rule 24(b)(1)(B) ..........................................23

    C.    An expedited ruling on this Motion to Intervene is appropriate so that the Proposed Intervenors can oppose the TRO Motion....................................................24

IV.   Conclusion.....................................................................29

## TABLE OF AUTHORITIES

Page

CASES

*All. for the Wild Rockies v. Kimbell*,
   CV 06-63-M-DWM, 2006 WL 8430428 (D. Mont. Aug. 7, 2006) ...................23

*Arkaki v. Cayetano*,
   324 F.3d 1078 (9th Cir. 2003) ...........................................................................15

*Bennett v. Yoshina*,
   140 F.3d 1218 (9th Cir.1998) ............................................................................25

*Burdick v. Takushi*,
   504 U.S. 428 (1992)............................................................................................26

*Cal. Democratic Party v. Jones*,
   530 U.S. 567 (2000)............................................................................................19

*Citizens for Balanced Use v. Mont. Wilderness Ass'n*,
   647 F.3d 893 (9th Cir. 2011) .........................................................16, 20, 21, 22

*Citizens for Legislative Choice v. Miller*,
   993 F. Supp. 1041 (E.D. Mich.), *aff'd*, 144 F.3d 916 (6th Cir.
   1998) ....................................................................................................................27

*Feldman v. Ariz. Sec'y of State's Office*,
   No. CV-16-01065-PHX-DLR, 2016 WL 4973569 (D. Ariz. June
   28, 2016) .............................................................................................................24

*Griffin v. Burns*,
   570 F.2d 1065 (1st Cir. 1978)....................................................................25, 26

*Guardians v. Hoover Mont. Trappers Ass'n*,
   CV 16–65–M–DWM, 2016 WL 7388316 (D. Mont. Dec. 20,
   2016) ...................................................................................................................15

*Harris Cty. Comm'rs Ct. v. Moore*,
   420 U.S. 77 (1975)..............................................................................................28

**TABLE OF AUTHORITIES**
**(continued)**

*Hollander v. McCain,*
566 F. Supp. 2d 63 (D.N.H. 2008)......................................................................19

*Kollmans v. City of Los Angeles,*
737 F.2d 830 (9th Cir. 1984) ............................................................................27

*Kusper v. Pontikes,*
414 U.S. 51 (1973)............................................................................................19

*Larson v. State By & Through Stapleton,*
2019 MT 28, 394 Mont. 167, 434 P.3d 241 ......................................................25

*Low v. Altus Fin. S.A.,*
44 Fed. App'x. 282 (9th Cir. 2002) ..................................................................16

*Orange Cty. v. Air California,*
799 F.2d 535 (9th Cir. 1986) ............................................................................23

*Owen v. Mulligan,*
640 F.2d 1130 (9th Cir. 1981) ..........................................................................18

*Paher v. Cegavske,*
No. 3:20-cv-00243-MMD-WGC, 2020 WL 2042365 (D. Nev. Apr.
28, 2020) ............................................................................................................23

*Pennhurst State Sch. & Hosp. v. Halderman,*
465 U.S. 89 (1984)..............................................................................2, 27, 28

*Perry v. Proposition 8 Official Proponents,*
587 F.3d 947 (9th Cir. 2009) ........................................................................22, 24

*R.R. Comm'n of Tex. v. Pullman Co.,*
312 U.S. 496 (1941)..........................................................................................2, 28

*Schultz v. Williams,*
44 F.3d 48 (2d Cir. 1994) ................................................................................18

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Smith v. Los Angeles Unified Sch. Dist.*,
  830 F.3d 843 (9th Cir. 2016) ...................................................................15, 16

*Stiles v. Blunt*,
  912 F.2d 260 (8th Cir.1990) ...............................................................27

*Tex. Democratic Party v. Benkiser*,
  459 F.3d 582 (5th Cir. 2006) .............................................................18

*Timmons v. Twin Cities Area New Party*,
  520 U.S. 351 (1997)...........................................................................26

*Venegas v. Skaggs*,
  867 F.2d 527 (9th Cir.1989), *aff'd,* 495 U.S. 82 (1990)...............................23, 24

*Wilderness Soc'y v. U.S. Forest Serv.*,
  630 F.3d 1173 (9th Cir. 2011) ..........................................................17

*Zielasko v. State of Ohio*,
  873 F.2d 957 (6th Cir.1989) .............................................................27

STATUTES

MCA Section 13-10-601(2)(b) ...........................................................5

MCA §§ 13-37-601 *et seq.*.................................................................7

OTHER AUTHORITIES

Fed. R. Civ. P. 24(a).........................................................................15, 24

Fed. R. Civ. P. 24(b) ........................................................................23, 24

Federal Rules of Civil Procedure, Rules and Commentary Rule 24
  (2018)..............................................................................................20

Montana Constitution Article II, Sections 6 and 7 ................................14

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

U.S. Constitution, First Amendment ......................................................................19

U.S. Constitution, Eleventh Amendment................................................................27

**EXHIBIT INDEX**

| Exhibit | Title |
|---------|-------|
| A | Findings of Fact, Conclusions of Law, and Order (Lewis and Clark County Case No. CDV-2020-856) |
| B | Montana Green Party's April 14, 2020 Facebook post |
| C | Defendant's Brief in Response to MTGOP's Motion to Intervene (Lewis and Clark County Case No. CDV-2020-856) |
| D | Reply Brief Supporting MTGOP's Motion to Intervene (Lewis and Clark County Case No. CDV-2020-856) |
| E | Affidavit of Royal Aubrey Davis (Lewis and Clark County Case No. CDV-2020-856) |
| F | Affidavit of Gary Marbut (Lewis and Clark County Case No. CDV-2020-856) |
| G | Motion to Invervene of Gary Marbut (Lewis and Clark County Case No. CDV-2020-856) |

# MEMORANDUM OF LAW

The Montana Democratic Party, Ryan Filz, Madeline Neumeyer, and Rebecca Weed (together, "Proposed Intervenors") submit this memorandum of law in support of their Emergency Motion to Intervene as Defendants and respectfully request expedited consideration of the same.

Plaintiffs in this case have filed a Motion for a Temporary Restraining Order ("TRO Motion") asking this Court to nullify an order issued by a Montana state court (the "State Court Order") in a lawsuit in which the Proposed Intervenors were the plaintiffs.[1] The State Court Order was issued after a two-day evidentiary hearing and based on a careful consideration of an extensive evidentiary record. The named Defendant in this case—the Montana Secretary of State (the "Secretary")—is the Defendant in the state court action and has sought an expedited review and appeal of the State Court Order before the Montana Supreme Court, which is expected to rule before August 20.

Rather than pursuing their claims in state court, Plaintiffs have now come to this federal Court and seek an expedited ruling in the form of a Temporary Restraining Order that would effectively overrule the State Court Order and require the Secretary to include purported Green Party Candidates on the general election

---

[1] The State Court Order is attached as Exhibit A to this brief.

ballot by August 20—a mere seven days from today. Plaintiffs' claims are

meritless, and Proposed Intervenors respectfully ask this Court to expedite the

briefing and its decision on this Motion to Intervene so that Proposed Intervenors

may file a response to the TRO Motion by August 17, as the Secretary was ordered

to do. ECF 6.

 If the normal briefing schedule is applied to this motion to intervene, and if

the TRO Motion is granted, Proposed Intervenors will suffer immediate,

irreparable harm to their constitutional rights. In contrast, Plaintiffs' constitutional

rights have *not* been violated by the State Court Order, and the *Pennhurst* and

*Pullman* abstention doctrines strongly suggest that this Court should not interfere

with an injunction issued by the state court and currently on appeal to the Montana

Supreme Court.

## I. INTRODUCTION

 This action is nothing more than an attempt to end run around a state court

decision enjoining a state official from violating state law—a decision that is

currently being appealed by the named Defendant in this case and on which the

Montana Supreme Court is expected to issue a decision shortly.

 The facts in that case are extraordinary.  They involve a secret and deceitful

effort by the Montana Republican Party to circulate petitions to qualify the

Montana Green Party for the ballot, *petitions that the real Montana Green Party disclaimed*, which led to the placement of purported Green Party candidates on the ballot—*candidates the real Montana Green Party has publicly stated are not real Green Party candidates*. The Proposed Intervenors include the Montana Democratic Party and several voters duped into signing the fake Green Party petitions, who are the plaintiffs in the state court action and should be allowed to intervene here to protect the very same interests they have asserted in that case.

After the Montana Green Party publicly disavowed the unauthorized petition effort and the Montana Republican Party's involvement was revealed by the press, hundreds of petition signers withdrew their signatures. The Secretary—one of the Montana Republican Party's most senior elected officials—refused to accept signature withdrawals, in violation of Montana law, and qualified purported Green Party candidates for the ballot, including two of the Plaintiffs in the instant action. The Secretary conceded that these candidates would not qualify for the ballot if the withdrawal requests were honored and the withdrawn signatures were not counted.

The Proposed Intervenors filed a complaint in state court (the "State Court Action"), alleging violations of state law and the Montana State Constitution. The Secretary vigorously opposed Proposed Intervenors' claims at every stage of the case, and invited the Montana Republican Party to intervene in the State Court

Action to assist his defense. Plaintiffs Royal Davis and Gary Marbut also worked with the Montana Republican Party on this effort, submitting declarations in support of the Montana Republican Party's attempt to intervene. After the state court denied the Montana Republican Party intervention, Plaintiff Marbut filed an untimely motion to intervene on his own behalf. Although Plaintiff Davis indicated that he was considering intervening, he never attempted to do so.

After a two-day evidentiary hearing, the state court issued the State Court Order, which held that the Secretary violated state law and that the Proposed Intervenors would be irreparably harmed by the Secretary's actions. The State Court Order enjoined the Secretary from including the Green Party on the general ballot for the 2020 general election. To be clear: at no point has the *real* Montana Green Party argued that it—or any candidates affiliated with it—qualified for or should be permitted to appear on the Montana ballot.

The Secretary has sought an emergency appeal of the State Court Order before the Montana Supreme Court, and that appeal is in process, with expedited briefing and a decision expected before August 20. Plaintiff Marbut has not appealed the state court's denial of his untimely motion to intervene. Instead, he, Plaintiff Davis, and two voters filed this action. Plaintiffs Marbut and Davis assert that they have a right to appear on the ballot as candidates, and the voter plaintiffs

assert that, as voters, they have a right to have certain candidates on the ballot. Plaintiffs allege that the State Court Order violated their right to substantive due process under the United States Constitution, even though they have no Due Process right to force candidates onto a ballot in violation of Montana law.

Proposed Intervenors now seek to intervene to protect their rights under Montana law and the Montana Constitution. The Secretary—who is adversarial to Proposed Intervenors in the state court action and who vigorously contested the state court action—obviously will not protect the Proposed Intervenors' interest.

## II.   STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.   Out-of-state paid petition gatherers attempted to qualify the Montana Green Party for ballot access—and were denounced by the Montana Green Party.

In early 2020, an effort began to collect signatures for a petition to obtain ballot access in the November 2020 election for the Montana Green Party (the "Petition"). State Court Order at 5–6 ¶¶ 14-17. A political party seeking to petition to select their nominees by primary ballot in Montana must submit a petition that contains a minimum number of signatures as set by Montana law. Section 13-10-601(2)(b), MCA; State Court Order at 5 ¶ 13.

From the beginning, there was no public information regarding who financed the Petition effort. *Id.* ¶ 17. Intervenors Neumeyer and Weed signed the

petition because they assumed that the Petition was being advanced by an

environmental organization or the Montana Green Party, as did another plaintiff in

the State Court Action. *Id. ¶¶* 14-16. By mid-February the individuals collecting

signatures for the Petition (the "Petition Circulators") had finished collecting

almost all the petition signatures they would eventually turn in.  *Id.* ¶ 17.

On February 12, the Montana Green Party publicly disavowed the Petition

and stated *that it had no candidates running in Montana*. *Id.* ¶ 18. Local reporters,

however, were unable to identify any group that was financing the Montana Green

Party petition effort. *Id.* ¶ 21. By the time that the Petition Circulators had finished

collecting signatures, Montanans still did not know who was financing the Petition

effort. *See id.* ¶ 21 ("[I]n the realm of shenanigans, some unknown group has

gathered signatures and submitted petitions around the state to qualify the Green

Party for the ballot, a move that is seen as possibly helping Republican candidates.

The Green Party in Montana says it's not them. And a conservative PAC, the Club

for Growth, says it's not them either. So who is it?") (quoting a February 21 local

news report).

This lack of transparency about the Petition effort was particularly egregious

because only a year before, the Montana Legislature passed bipartisan legislation

to require prompt disclosure of contributions and expenditures made in an effort to

petition to qualify a minor political party for primary elections—and did so directly in response to a prior similar effort on the part of unknown individuals or groups in 2018 to petition to qualify the Montana Green Party for ballot access. *Id.* ¶¶ 22-26; §§ 13-37-601 *et seq.*, MCA.

As the news spread of the misleading Petition and as the Petition Circulators began turning in the petitions just before the March 2nd deadline, signers began to demand that their names be removed from the Petition. State Court Order at 10–11 ¶¶ 30-31, 34. This included Intervenor Weed and another plaintiff in the State Court Action, who attempted to withdraw their signatures after learning that an unknown entity other than the Montana Green Party was behind the effort. *Id.* at 11 ¶ 34, 24 ¶¶ 83-84, 28 ¶ 101.

On Friday, March 6, the Secretary announced that the Montana Green Party had submitted enough purportedly valid signatures to qualify to nominate its candidates through a primary election. State Court Order ¶ 31.  At the time of the Secretary's announcement, it was still unclear what entity was behind the Petition effort. *Id.* ¶ 33.

By the close of the candidate filing deadline two days later, only six candidates had filed to run in Green Party primary elections for legislative and statewide offices. Plaintiffs Davis and Marbut are two of those candidates.

Cheryl Wolfe, a Montana Green Party activist and Treasurer of the Party, later posted on the Montana Green Party's Facebook page that "*none of those running under the Montana Green Party ticket this season are actual Greens as far as we can tell*. They have not been involved in Montana Green Party activities." *See* Exhibit B (Facebook post).

> ### B.   Local reporters uncovered the Montana Republican Party's secret financial backing of the Petition, which violated Montana law.

On March 24, weeks after the Secretary announced that the Petition contained enough valid signatures, the public finally learned the truth: the mystery group behind the Montana Green Party signature gathering effort was the Montana Republican Party. State Court Order at 19–20 ¶ 65. The Montana Republican Party Central Committee contracted directly with the Texas-based petition gathering firm Advanced Micro Targeting for these efforts—the very same firm whose 2018 Montana Green Party petitions had been invalidated by the Montana Supreme Court, and whose funders had never been revealed. *Id.* at 20 ¶ 67.

To cover up its involvement in the 2020 Petition, the Montana Republican Party had created a shell group titled "Montanans for Conservation," and made a $100,000 contribution to the group to cover the payment to Advanced Micro Targeting. *Id.* Rather than comply with the newly-enacted requirement to file a

statement of organization as a minor party qualification committee within five days of beginning their operations, Montanans for Conservation instead filed as an independent committee. *Id.* at 19 ¶ 63. As a result, the filing only appeared in the Montana Commissioner of Political Practice ("COPP") public database mixed in among the hundreds of filings for independent political action committees registered in the state, and not among the handful of documents for minor party qualification committees registered in the state. *Id.* ¶¶ 63-64. Montanans for Conservation only amended its filing to accurately disclose its status as a political party qualification committee on March 23, a day before the newspaper articles ran exposing its involvement in supporting the Petition. *Id.* ¶ 65.

COPP later determined that the actions by Montanans for Conservation, the Montana Republican Party, and the Club for Growth Action violated the campaign finance laws—laws that were passed as a result of similar petition gathering funded by an unknown entity during the 2018 election. *Id.* at 20 ¶ 68.

### C. After the truth came out, hundreds of signers withdrew their signatures from the Petition.

After the revelation of the Montana Republican Party's involvement, the flow of withdrawals became a flood. *Id.* at 21 ¶ 73. This included Proposed Intervenors Filz and Neumeyer, who both withdrew their signatures from the Petition. *Id.* at 24 ¶¶ 83-84.

Proposed Intervenor Montana Democratic Party mobilized to inform signers about the truth and sought to help signers remove their names. *Id.* at 20–21 ¶ 69. There was no form available for withdrawing from a political party petition, so many individuals used the Secretary's Request for Withdrawal of Petition Signature form ("Withdrawal Form"), which is prescribed for signers of "constitutional amendment, constitutional convention, initiative, or referendum" and requires a notarized signature or signature in front of an elections official. *Id.* at 22 ¶ 75.

The COVID-19 pandemic and ensuing statewide stay-at-home order made signers' attempts to remove their signatures from the Petition substantially more difficult. *Id.* ¶ 77. Many signers were unable or understandably unwilling to travel to a county elections office or visit a notary, and instead opted to sign the form electronically using Docusign. *Id.* at 22–23 ¶¶ 78-82.

Even in the middle of a global pandemic, hundreds of voters submitted forms to county elections offices requesting that their signature be withdrawn. *Id.* at 25 ¶ 92.  Prior to the June 2, 2020, Primary Election, well over 500 signers, including the individual Proposed Intervenors, had requested to be removed from the Petition. *Id.* In the State Court Action, the Secretary conceded that the Petition

does not meet the statutory threshold for qualification to be on the ballot after accounting for these withdrawals. *Id.* at 27 ¶ 96.

### D. The Secretary arbitrarily refused to accept hundreds of withdrawals with no legal grounds for doing so.

Montana law has long recognized the right of petition signers to withdraw their names from a petition. *Id*. at 41 ¶ 35, 45 ¶ 51. There are no statutes or administrative rules setting out requirements for such a withdrawal, and the Secretary did not give any notice to the public that withdrawals would have to comply with any particular requirement. *Id*. at 14 ¶¶ 45-46, 15 ¶ 49. Similarly, there are no statutes or administrative rules setting out the deadline for withdrawals, and the Secretary did not give any notice to the public that he would refuse to honor withdrawals submitted after the date that the Secretary determined that there were sufficient signatures to qualify for the ballot, or that such date would be March 6.  *Id.* at 14–15 ¶¶ 47-48.

Notwithstanding the lack of any rule, statute, or public notice, the Secretary took the position that a person's withdrawal was ineffective unless that person (1) used the Withdrawal Form prescribed for other types of petitions, even though that form is not required for political party qualification petitions; (2) signed the form by hand, rather than using electronic signatures; (3) had the form notarized or

signed by a county elections official, and (4) submitted the form no later than March 6, 2020. *Id.* ¶¶ 44-48.

The Secretary took these positions without informing either the public or the county election officials. Instead, the Secretary sent an email to county elections officials on March 3, 2020 informing them that petition signers *can* withdraw petitions until "the person or body created by law to determine the matter submitted by the petition has finally acted." *Id.* at 15 ¶ 51. The email failed to inform elections officials that that the Secretary believed he was that person, or that he believed final action would occur on March 6, 2020, when the Secretary announced the Petition contained a sufficient number of signatures to put the Green Party on the ballot.  *Id.* at 16 ¶ 52. The email also did not contain any instructions regarding what form should be used, whether a withdrawal form must be signed, or what kinds of signatures are acceptable. *Id.* ¶ 54. Furthermore, the email was not made public until July 14, when the Secretary disclosed it as an exhibit in the hearing in the State Court Action. *Id.* at 17 ¶ 55.

As a result of the Montana Republican Party's deceptive behavior in violation of Montana's campaign finance laws, Green Party candidates were included on the primary ballot. Fortunately, this effort was halted by the state court.

**E.    The State Court Order enjoined the Secretary of State from including unqualified Green Party Candidates on the general election ballot.**

On June 1, 2020, Proposed Intervenors initiated an action in Montana's First Judicial District Court against the Secretary, alleging that the Secretary's actions violated Montana law and violated their rights under the Montana Constitution (the "State Court Action"), and seeking to enjoin the Secretary from implementing the certification of the Montana Green Party's Petition.

The Montana Republican Party moved to intervene as a defendant in the State Court Action with the Secretary's full support. Ex. C. Plaintiffs Royal Davis and Gary Marbut submitted declarations in support of the Montana Republican Party's attempt to intervene. Exs. D, E, & F. After the state court denied the Montana Republican Party intervention, Plaintiff Marbut filed an untimely motion to intervene on his own behalf. Ex. G. Although Plaintiff Davis indicated that he was considering intervening, he never attempted to do so. *See* Ex. E.

On August 7, after a two-day evidentiary hearing, the State court issued the detailed, 50-page State Court Order.  Among other things, the state court held that the Montana Republican Party's failure to properly and timely disclose its involvement in the Petition was "intentionally designed to create an advantage for [the Montana Republican Party] at the expense of unwitting signers," and in

violation of Montana's campaign finance rules.  State Court Order at 43 ¶ 43. The court further found that the Secretary improperly failed to give effect to withdrawal requests in violation of Article II, Sections 6 and 7 of the Montana Constitution by imposing arbitrary deadlines for withdrawal forms and by adopting a rule or policy banning the use of electronic signatures without input or proper notice to the public. The court further found that, after accounting for the valid withdrawal forms, the Montana Green Party failed to qualify for the ballot because the Petition did not meet the threshold signature requirement under Montana's election law. The court enjoined the Secretary from "implementing or giving any effect" to the Petition. *Id.* at 49 ¶ 5.

The Secretary immediately appealed to the Montana Supreme Court. The Montana Supreme Court granted an expedited briefing schedule under which briefing will be complete on August 18. A decision is expected by August 20.

Plaintiffs subsequently filed this action, which alleges a single cause of action under federal law—substantive due process—based on their purported right to appear on the ballot or vote for candidates on the ballot. Plaintiffs ask *this Court* to enjoin the Secretary to do the very thing that the *state court* enjoined the Secretary from doing. Proposed Intervenors therefore seek to intervene to protect their rights, including those recognized by the state court.

### III.    ARGUMENT

#### A.    The Proposed Intervenors are entitled to intervene as a matter of right.

The Proposed Intervenors meet the standard for intervention as a matter of right under Federal Rule of Civil Procedure 24(a)(2). "Rule 24 traditionally receives liberal construction in favor of applicants for intervention." *Arkaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003); *see also Guardians v. Hoover Mont. Trappers Ass'n*, CV 16–65–M–DWM, 2016 WL 7388316, at *1 (D. Mont. Dec. 20, 2016)..

An entity or individual seeking to intervene under Rule 24(a)(2) must meet four elements: (1) the prospective intervenor's motion must be timely; (2) the would-be intervenor must have a significantly protectable interest relating to the subject of the action; (3) the intervenor is so situated that disposition of the action may as a practical matter impair or impede their ability to protect that interest; and (4) such interest is inadequately represented by the parties to the action. *Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 853 (9th Cir. 2016); *see also* Fed. R. Civ. P. 24(a).

These four elements "are to be broadly interpreted in favor of intervention." *Smith*, 830 F.3d at 853 (quotation marks and alterations omitted). Further, a court's review should be "guided primarily by practical considerations, not technical

distinctions." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (quotations omitted). Given that Plaintiffs seek to collaterally attack the State Court Order that was issued in response to the complaint brought by Intervenors against the Secretary, all four elements are easily met.

### 1.    The Motion to Intervene is timely.

Having filed their Motion to Intervene within two days of Plaintiffs' filing of their Complaint, Proposed Intervenors have met the timeliness requirement.

"Timeliness is determined by the totality of the circumstances facing would-be intervenors, with a focus on three primary factors: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *Smith*, 830 F.3d at 854 (quotation omitted). When a motion to intervene is filed "at an early stage of the proceedings," the Ninth Circuit has recognized that "the parties would not have suffered prejudice from the grant of intervention at that early stage, and intervention would not cause disruption or delay." *Citizens for Balanced Use*, 647 F.3d at 897. At this early stage, "the district court has made no factual findings, there [has] been no summary judgment proceedings, discovery is in its early stages with no set cut-off date, and there is no trial date." *Low v. Altus Fin. S.A.*, 44 Fed. App'x. 282, 284 (9th Cir. 2002). There can be no real dispute that the timeliness

requirement is met here. In addition, Proposed Intervenors stand ready to file an

opposition to the Motion for TRO by August 17 if allowed to intervene. Plaintiffs

and the Secretary will not suffer any prejudice, nor will the intervention cause

disruption or delay.

>    2.    **The Proposed Intervenors possess significant, legally
>           cognizable interests in the substance of this litigation.**

The Ninth Circuit's "significantly protectable interest" test "is primarily a

practical guide to disposing of lawsuits by involving as many apparently concerned

persons as is compatible with efficiency and due process." *Wilderness Soc'y v.*

*U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011) (quotation omitted). It is

"generally enough that the interest is protectable under some law, and that there is

a relationship between the legally protected interest and the claims at issue." *Id.*

(quotation omitted). Thus, "a prospective intervenor has a sufficient interest for

intervention purposes if it will suffer a practical impairment of its interests as a

result of the pending litigation." *Id.* (quotation omitted). Proposed Intervenors'

status as plaintiffs in the State Court Action, which addresses the ability of the

Green Party to appear on the ballot in the 2020 general election, establishes their

legally protectable interest in this action.

Specifically, the Montana Democratic Party has a significant, legally

cognizable interest in the substance of this litigation as a statewide political party

because—as the state court specifically held—"[a]llowing the Montana Green Party to qualify under the political party qualification statute, and thus obtain primary and general election ballot access, when it has not shown sufficient support as required by statute, would result in [Montana Democratic Party] having to expend additional funds and resources to educate and persuade voters to support Democratic candidates over candidates claiming to be affiliated with the Montana Green Party in the 2020 general election." State Court Order at 32 ¶ 32; *see also Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) (affirming state party "would suffer an injury in fact because it would need to raise and expend additional funds and resources to prepare a new and different campaign in a short time frame") (quotation omitted).

Similarly, the inclusion of ineligible Green Party candidates on the ballot would have a concrete and substantial adverse impact on the Montana Democratic Party due to the increased and unfair competition it would face from candidates who did not properly qualify to be there. *See Owen v. Mulligan*, 640 F.2d 1130, 1132 (9th Cir. 1981) (holding "the potential loss of an election" is sufficient injury to confer Article III standing); *see also Benkiser*, 459 F.3d at 587–88 (5th Cir. 2006) (recognizing "harm to [] election prospects" was "a concrete and particularized injury"); *Schultz v. Williams*, 44 F.3d 48, 53 (2d Cir. 1994) (political

parties incur "concrete, particularized, actual injury—[due to] competition on the ballot from candidates that . . . were able to avoid complying with the Election Laws"); *Hollander v. McCain*, 566 F. Supp. 2d 63, 68 (D.N.H. 2008) ("inclusion of an allegedly ineligible rival on the ballot" constituted injury to the party). Indeed, this seems to be the very purpose of this entire scheme.

The individual Proposed Intervenors likewise have a significant, legally cognizable interest in this litigation because, if Plaintiffs succeed, "they will suffer a concrete injury by being forced to be associated with a petition organized and funded by a political party with which they do not want to be associated, and by being deprived of their right to withdraw their names from the petition." State Court Order at 33 ¶ 6; *see also Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) (holding First Amendment is violated when a law harms a voter's "right *not to associate*") (emphasis added); *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973) (finding First Amendment rights burdened when a statute "'lock[ed]' the voter into his pre-existing party affiliation for a substantial period of time"). This same injury extends to the Montana Democratic Party, which acts as a membership organization for Democratic voters in Montana, though which members "express their collective views and protect their collective interest." State Court Order at 32 ¶ 5.

### 3.   The disposition of this litigation may impair the Proposed Intervenors' ability to protect their interests.

The Ninth Circuit has held that if the party seeking intervention "would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." *Citizens for Balanced Use*, 647 F.3d at 898 (9th Cir. 2011) (alterations omitted). Essentially, if a court finds a significant protectable interest, it will generally have "little difficulty concluding that the disposition of the case may, as a practical matter, affect it." *Id*. (alterations omitted); *see also* 1 Federal Rules of Civil Procedure, Rules and Commentary Rule 24 (2018) ("In making this determination, courts assess the practical consequences of the litigation and may consider any significant legal effect on the applicant's interest.").

As described above, if the Court were to grant Plaintiffs' TRO Motion, the Montana Democratic Party and the individual Proposed Intervenors would be practically and significantly impacted by the presence of ineligible Green Party nominees on the 2020 general election ballot. The State Court already has recognized as much, and a TRO here would entirely undo the relief they were awarded there. State Court Order at 30–31 ¶¶ 110–16.

Moreover, absent intervention, if the TRO Motion were granted, Proposed Intervenors would have no way to seek review of the Court's ruling. As discussed

more below, it can be presumed, based on the Secretary's defense of the State

Court Action, that the Secretary is unlikely to defend or appeal a grant of the TRO.

Intervention is therefore necessary.

### 4. Defendant's representation of the interests of the Proposed Intervenors would be inadequate.

Proposed Intervenors cannot rely on the Secretary to adequately represent

their interests in upholding the State Court Order for the obvious reason that the

Secretary *vigorously opposed* the Proposed Intervenors in the state court action.

The burden of showing inadequacy of representation is "minimal," requiring the

proposed intervenor to show "that representation of its interests 'may be'

inadequate." *Citizens for Balanced Use*, 647 F.3d at 898 (emphasis added). "The

'most important factor' in assessing the adequacy of representation is 'how the

interest compares with the interests of existing parties.'" *Id.*

The Secretary is adverse to Proposed Intervenors in the State Court Action,

having defended his decision to qualify the Green Party as a minor party in

violation of Montana law. The Secretary stood by his position in the face of

unrefuted evidence of deceptive conduct and refused to honor the requests of

hundreds of Montana voters to withdraw their signatures after the deceitful

behavior came to light. The Secretary has conceded that, had he honored those

withdrawals, the Green Party would have lacked the requisite number of signatures

to qualify for the ballot. State Court Order at 97 ¶ 96. Notwithstanding the lack of any legal support for his position and his resounding defeat in the State Court Action, the Secretary is *currently appealing* the State Court Order to the Montana Supreme Court. This adversarial position is more than enough to make a compelling showing that Proposed Intervenors' interests are not adequately represented by the Secretary. *Citizens for Balanced Use*, 647 F.3d at 900-901 (finding government would not adequately represent intervenor's interests due to prior adversarial relationship and government's appeal of a district court's ruling).

It is also clear that the Secretary will not make all of the arguments the Proposed Intervenors would make. *See Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 952 (9th Cir. 2009). Not only has the Secretary shown himself willing to qualify the Green Party for the ballot in violation of Montana law, the Secretary, as a member of the Montana Republican Party, has no interest in raising the rights and interests of the Montana Democratic Party or its candidates in maximizing their chances for electoral success and in not having to spend additional funds or resources to compete with an ineligible political party. Nor does the Secretary seem concerned with the right of the individual voters to not be forced to associate with the Green Party, since the Secretary already declined to honor the withdrawal of the individual intervenors' signature from the petition to

qualify the Green Party for the ballot. *See Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2042365, at *3 (D. Nev. Apr. 28, 2020).

**B.** **In the alternative, the Court should exercise its discretion to grant the Proposed Intervenors permission to intervene under Rule 24(b)(1)(B).**

If the Court does not grant intervention as a matter of right, Proposed Intervenors easily satisfy the requirements for permissive intervention under Federal Rule of Civil Procedure 24(b).

"Permissive intervention is committed to the broad discretion of the district court." *Orange Cty. v. Air California*, 799 F.2d 535, 539 (9th Cir. 1986); *All. for the Wild Rockies v. Kimbell*, CV 06-63-M-DWM, 2006 WL 8430428, at *1 (D. Mont. Aug. 7, 2006). Permissive intervention is appropriate if the moving party satisfies three requirements: "(1) the movant must show an independent ground for jurisdiction; (2) the motion must be timely; and (3) the movant's claim of defense and the main action must have a question of law and fact in common." *Venegas v. Skaggs,* 867 F.2d 527, 529 (9th Cir.1989), *aff'd,* 495 U.S. 82 (1990). Additionally, "[i]n exercising its discretion to grant or deny permissive intervention, a court must

consider whether the intervention will 'unduly delay or prejudice the adjudication of the'" original parties' rights. *Id.* at 530 (quoting Fed. R. Civ. P. 24(b)(3)).[2]

For, the reasons discussed in Section III(A)(4), *supra*, Proposed Intervenors motion is timely and will not unduly delay or prejudice the adjudication of the original parties' rights.

Moreover, the Proposed Intervenors' defenses to Plaintiffs' claims share common questions of law and fact. If allowed to intervene, the Proposed Intervenors will assert defenses directly responsive to the claims for injunction asserted by Plaintiffs.

### C.   An expedited ruling on this Motion to Intervene is appropriate so that the Proposed Intervenors can oppose the TRO Motion.

Because Plaintiffs have asked for a decision on the TRO Motion by August 20, and because the Montana Supreme Court is also expected to rule by August 20, Proposed-Intervenors respectfully request that this motion be expedited and they be allowed to immediately intervene to protect their interests. An expedited ruling on this motion would allow intervenors to oppose the TRO motion on August 17 and seek dismissal of the complaint on multiple grounds, including:

---

[2] When a proposed intervenor has met the requirements of Rule 24(b)(1)(B), the court may consider additional factors in the exercise of its discretion, including "'the nature and extent of the intervenors' interest' and 'whether the intervenors' interests are adequately represented by other parties.'" *Perry*, 587 F.3d at 955. "Unlike Rule 24(a)," however, "subsection (b) does not require a showing of inadequacy of representation." *Feldman v. Ariz. Sec'y of State's Office*, No. CV-16-01065-PHX-DLR, 2016 WL 4973569, at *2 (D. Ariz. June 28, 2016) (quotation omitted).

*There is no violation of substantive due process.* Plaintiffs seek to conjure a due process claim where none exists. In fact, Plaintiffs cannot satisfy either of the elements they themselves cite as a requirement for their substantive due process grounds. First, as to Montana voters' "likely reliance [...] on an established election procedure and/or official pronouncements about what the procedure will be in the coming election," *Bennett v. Yoshina*, 140 F.3d 1218, 1226-27 (9th Cir.1998), Plaintiffs have the facts backwards. Montana voters have relied on Montana's long-standing election procedures enacted with purpose of ensuring that previously unqualified political parties qualify for ballot access only upon the knowing request of the requisite numbers of confirmed registered voters in the requisite number of Montana counties. *Larson v. State By & Through Stapleton*, 2019 MT 28, ¶ 30, 394 Mont. 167, 191, 434 P.3d 241, 256. The decision in the State Court Action protects that long-standing expectation, whereas the relief sought by Plaintiffs would undermine it. As to the second element, the existence of a "significant disenfranchisement that results from a change in the election procedure," *id.*, there has been no "significant disenfranchisement." In *Griffin v. Burns*, the principal case relied upon by Plaintiff, the court addressed a primary election in which some votes were counted and others were invalidated in the same contest between two candidates. There was no question that the party was eligible

under state law to hold that primary election to select between those candidates, or that the winner of that primary election was entitled to general election ballot access as the nominee of that party. *See* 570 F.2d 1065, 1078-79 (1st Cir. 1978). That is a far cry from the facts here. As the state court found, the Green Party does not have the right under state law to obtain general election ballot access for its candidates through a primary election, and the fact that primary votes were tabulated for Green Party candidates does not mean that those candidates are entitled under state law to appear on the general election ballot. Indeed, the *real* Montana Green Party has "disavowed the persons filing under the Green Party banner as not being true Green Party members or adherents." State Court Order at 37 ¶ 20 n.8; *see also* Exhibit B.

   ***No Right to Ballot Access.*** Plaintiffs also assert rights they do not possess. It is well established that political candidates do not have a "right" to be on the ballot. Indeed, "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). Further, "limiting the choice of candidates to those who have complied with state election law requirements is the prototypical example of a regulation that, while it affects the right to vote, is eminently reasonable." *Burdick v. Takushi*, 504 U.S. 428, 440,

n.10 (1992). Nor do Plaintiffs have a constitutionally "guaranteed [] right to vote for a specific candidate." *Citizens for Legislative Choice v. Miller*, 993 F. Supp. 1041, 1046 (E.D. Mich.), *aff'd*, 144 F.3d 916 (6th Cir. 1998); *Zielasko v. State of Ohio*, 873 F.2d 957, 961 (6th Cir.1989) (upholding provision of Ohio constitution that prohibited persons age 70 and over from being elected to judicial office); *see also Stiles v. Blunt*, 912 F.2d 260, 266 (8th Cir.1990) ("[Voters'] fundamental rights of voting, speech, and association do not confer on them an absolute right to support a specific candidate regardless of whether he or she has satisfied reasonable eligibility requirements.").

 *Pennhurst*. Plaintiffs seek to disrupt the federal-state balance by asking this Court to issue an injunction ordering the Secretary to place on the general election ballot the names of the Green Party candidates nominated by Plaintiffs. *See* ECF No. 1 at 17. But the eligibility of such candidates is based on state law, and a "federal court's grant of relief against state officials on the basis of state law . . . conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). Put simply, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Id.*; *see also Kollmans v. City of Los Angeles*, 737 F.2d

830, 836 n.18 (9th Cir. 1984) ("*Pennhurst* indicates that plaintiffs must go to state court to obtain relief based on state law."). As Proposed Intervenors will further detail in future filings, Plaintiffs' action cannot stand under *Pennhurst*.

     **Pullman abstention**. At this moment, there is an emergency appeal before the Montana Supreme Court. Accordingly, this Court should abstain under *Pullman* abstention because that court's ruling on Montana law in that pending state court proceeding will be dispositive. *See Harris Cty. Comm'rs Ct. v. Moore*, 420 U.S. 77, 83 (1975) ("Where there is an action pending in state court that will likely resolve the state-law questions underlying the federal claim, we have regularly ordered abstention."). After all, "[t]he reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court." *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941). While abstention is, and should be, rare in voting rights cases, for the reasons detailed above, this is not a voting rights case, because Plaintiffs have no right to appeal on the ballot when they have not qualified under state law to do so, or to vote for such ineligible candidates.

     For these reasons, Proposed Intervenors should be allowed to intervene and assert their defenses. Intervention is particularly appropriate where, as here, Plaintiffs' Complaint is but the latest iteration of a dispute regarding the legality of

the Montana Green Party's 2020 Petition. Allowing the Proposed Intervenors to

intervene would afford the Court the benefit of argument from the parties most

familiar with the underlying facts and legal issues.

## IV.    CONCLUSION

Proposed Intervenors respectfully request their motion to intervene be

granted on an expedited basis and that they be allowed to respond to the Motion for

TRO as soon as possible.


DATED:  August 13, 2020

By:*/s/ Peter M. Meloy*
Peter M. Meloy
MELOY LAW FIRM
P.O. Box 1241
Helena MT 59624
Telephone:  406.442.8670
Mike@meloylawfirm.com

Matthew P. Gordon
Kevin J. Hamilton, *pro hac vice* pending
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:  206.359.8000
Facsimile:   206.359.9000
MGordon@perkinscoie.com
KHamilton@perkinscoie.com

*Attorneys for Proposed Intervenor-Defendants*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 7.1(d)(2)(E) of the Montana Federal Local Rules of

Procedure, I certify that the foregoing Brief in Support of Emergency Motion to

Intervene as Defendants is printed with a proportionately spaced Times New

Roman typeface of 14 points, is double-spaced; and the word count calculated by

Microsoft Word is 6,500 excluding the caption, certificates of service and

compliance, table of contents and authorities, and exhibit index.

DATED:  August 13, 2020

By: */s/ Peter M. Meloy*
_____
Peter M. Meloy
MELOY LAW FIRM
P.O. Box 1241
Helena MT 59624
Telephone:  406.442.8670
Mike@meloylawfirm.com

Matthew P. Gordon
Kevin J. Hamilton, *pro hac vice* pending
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:  206.359.8000
Facsimile:   206.359.9000
MGordon@perkinscoie.com
KHamilton@perkinscoie.com

*Attorneys for Proposed Intervenor-*
*Defendants*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**FILED**

AUG 0 7 2020

ANGIE SPARKS / Clerk of District Court
By _____ Deputy Clerk

## MONTANA FIRST JUDICIAL DISTRICT COURT
## LEWIS AND CLARK COUNTY

| | |
|---|---|
| MONTANA DEMOCRATIC PARTY,<br><br>and<br><br>TAYLOR BLOSSOM, RYAN FILZ, MADELINE NEUMEYER, and REBECCA WEED, individual electors,<br><br>   Plaintiffs,<br><br>v.<br><br>STATE OF MONTANA, by and through its SECRETARY OF STATE COREY STAPLETON,<br><br>   Defendant. | Cause No.: DDV-2020-856<br><br>**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |

This Court heard this matter on July 14 and 15, 2020.[1]  Peter Michael Meloy and Matthew Gordon represented Plaintiffs Taylor Blossom, Ryan Filz, Madeline Neumeyer, Rebecca Weed, and the Montana Democratic

---

[1] The more extensive and complicated procedural history of this matter is recited in the Findings of Fact, below.

1 | Party (MDP). Austin James and Matthew T. Meade represented Defendant State
2 | of Montana, by and through Secretary of State Corey Stapleton (Secretary).

3 |    The parties presented testimony and evidence and made oral
4 | arguments. Following the hearing, the parties submitted proposed findings of
5 | fact and conclusions of law and briefs. On July 17, 2020, the parties submitted
6 | notices of submittal.[2]

7 |    From the file, the testimony and evidence presented, the Court
8 | makes the following:

9 | <div align="center">**FINDINGS OF FACT**</div>

10 |    1. This matter came before the Court on an order to show cause
11 | on Plaintiffs' Complaint for Declaratory and Injunctive Relief.

12 |    2. Plaintiffs filed the complaint on June 1, 2020, against the
13 | Secretary, alleging that the Secretary erroneously failed to honor the requests of
14 | several hundred Montana voters to withdraw their names from a petition to
15 | obtain ballot access for the Montana Green Party for the November 2020 general
16 | election ballot. Plaintiffs alleged that once the withdrawals are accounted for, the
17 | petition fails to meet the requirements of Section 13-10-601(2), MCA, the
18 | political party qualification statute, because it does not contain the requisite
19 | number of valid signatures from at least thirty four legislative House Districts.

20 |    3. On Monday, June 22, 2020, the First Judicial District Court,
21 | Judge Kathy Seeley presiding, began a hearing on an order to show cause. Six
22 | days before the hearing, Plaintiffs filed a trial brief containing exhibits and
23 | declarations from Plaintiffs' trial witnesses. Late Friday before the hearing, and
24 | on the morning of the hearing, the Secretary filed various motions to dismiss the
25 | complaint and to vacate the hearing. Plaintiffs opposed all motions. At the

---

[2]  The Court has also granted status to certain entities and people to file briefs as *amici curiae* as set forth in the findings of fact below and in the accompanying Order on Supplemental Motion.

1    hearing before Judge Seeley, counsel argued the Secretary's motions about
2    whether to proceed, and upon hearing argument, the Court decided to proceed
3    with the hearing and hear evidence and testimony. The Secretary then requested
4    a two-minute recess during which the Secretary filed a motion to substitute Judge
5    Seeley. Judge Seeley referred the matter to Judges Mike Menahan and Michael
6    F. McMahon, both of whom declined to assume jurisdiction. Judge Seeley then
7    referred the matter to the undersigned, who accepted jurisdiction and set a
8    continuation of the show cause hearing for Tuesday, July 7.

9              4.      Prior to the July 7 hearing, the Montana Republican Party
10   (MTGOP) and two petition signers filed motions to intervene as defendants. The
11   MTGOP also filed a motion to reschedule the Tuesday, July 7 hearing. The
12   Secretary filed a response joining in the MTGOP's request to reschedule the
13   Tuesday, July 7 hearing. Plaintiffs opposed the motions to intervene and the
14   motion to reschedule the hearing. On the Sunday before the July 7 hearing, the
15   Secretary filed an emergency motion to continue the hearing due to a family
16   emergency that befell one of its counsel.

17             5.      Plaintiffs filed a supplemental trial brief containing exhibits
18   and declarations that reflected subsequent productions of public records by
19   county elections offices and the Secretary since the first hearing in the case. This
20   filing included copies of every signature withdrawal form known to Plaintiffs to
21   have been submitted to county elections offices or to the Secretary.

22             6.      On July 7, the parties convened before the Court. The Court
23   granted the Secretary's request to continue the hearing, and re-set the hearing to
24   begin Tuesday, July 14.
25   / / / / /

1

2

3

    7.    On July 8, the Secretary moved for partial summary judgment regarding the use of electronic signatures on withdrawal forms. Plaintiffs opposed the Secretary's motion and cross-moved for summary judgment on this issue.

4

5

    8.    On July 14 and 15, the Court held a two-day evidentiary hearing.

6

7

8

9

10

11

12

13

    9.    At the outset of the hearing on July 14, the Court denied the motions to intervene by the MTGOP and two individual signers of the petition. The Court granted these entities the right to file briefs as *amici curiae.* The two individual signers immediately filed a petition for a writ of supervisory control in the Montana Supreme Court seeking to reverse the Court's order denying their motion to intervene. The Montana Supreme Court denied the petition on July 15, noting Plaintiffs did not object to the signers' participation as *amici curiae.* *Campbell v. Montana First Judicial District Court,* No. OP 20-360.

14

15

16

17

18

19

20

21

    10.    The Court heard testimony from five witnesses for the Plaintiffs, including MDP representatives Kendra Miller and Trent Bolger, and individual plaintiffs Madeleine Neumeyer (Neumeyer), Rebecca Weed (Weed), and Taylor Blossom (Blossom). The Secretary called one witness, Dana Corson, the Secretary's Elections Director. On rebuttal, Plaintiffs re-called Kendra Miller and Trent Bolger to testify. All witnesses were subject to cross examination, and both parties offered exhibits into evidence. The Court concluded the hearing with closing argument on the issues presented in the case.

22

23

24

25

    11.    The political party qualification statute, § 13-10-601, MCA, specifies how parties are eligible to conduct a primary election. The statute has two ways by which a party may appear on the primary election ballot. First, a political party will appear on the primary ballot if it had a candidate for statewide

1   office in either of the last two general elections who received a total vote that was

2   at least five percent of the total vote received by the successful candidate for

3   governor. § 13-10-601(1), MCA.  Under this provision, MDP, the MTGOP and

4   the Montana Libertarian Party have qualified to appear on the primary ballot.

5         12.   If a party does not qualify under this previous subsection, it

6   may nevertheless qualify for the primary by submitting a petition, on a form

7   prescribed by the Secretary, requesting a primary election.  Section 13-10-

8   601(2)(a), MCA.  Section 13-10-601(2)(b), requires:

> The petition must be signed by a number of registered voters
> equal to 5% or more of the total votes cast for the successful
> candidate for governor at the last general election or 5,000 electors,
> whichever is less. The number must include the registered voters in
> more than one-third of the legislative districts equal to 5% or more of
> the total votes cast for the successful candidate for governor at the
> last general election in those districts or 150 electors in those
> districts, whichever is less.

15         13.   Montana has 100 legislative districts.  Mont. Const. Art. V,

16   section 2.  Therefore, as set forth in this statute, the petition must include the

17   verified signatures of registered voters in at least 34 legislative districts, being

18   "more than one-third of the legislative districts." Section 13-10-601(2)(b), MCA.

19         14.   Plaintiff Neumeyer signed the petition in Helena in February

20   2020.  Neumeyer believed the petition was being advanced by an environmental

21   organization.  She did not know the circulation of the petition was being funded

22   by the MTGOP, as explained below.  Neumeyer generally supports the

23   Democratic Party and Democratic candidates for office.  Had she known that the

24   MTGOP was behind the petition, she would not have signed it.

25   / / / /

1           15.    Plaintiff Weed signed the petition in Bozeman in February

2 2020. Weed believed the petition circulator was working with the Montana

3 Green Party to get the Green Party on the ballot. Weed generally leans towards

4 supporting the Democratic Party and usually supports Democratic candidates for

5 office. She did not know the circulation of the petition was being funded by the

6 MTGOP. Had she known that the MTGOP was behind the petition, she would

7 not have signed it.

8           16.    Plaintiff Blossom signed the petition in in Bozeman in

9 February 2020. Based on his conversation with the petition circulator, Blossom

10 believed that the petition circulator was working with the Montana Green Party to

11 get the Green Party on the ballot. Blossom considers himself to be a member of

12 the Democratic Party and supports Democratic candidates for office. He did not

13 know the circulation of the petition was being funded by the MTGOP. Had he

14 known that the MTGOP was behind the petition, he would not have signed it.

15           17.    By mid-February when the circulators had finished

16 collecting almost all of the petition signatures that they would eventually turn in,

17 there was not any public information as to whom was financing the Montana

18 Green Party petition effort, although there was discussion in the general news

19 media raising the question as to whom was financing this effort.

20           18.    On February 12, the Montana Green Party posted a message

21 on its Facebook page stating:

22 */ / / / /*

23 */ / / / /*

24 */ / / / /*

25 */ / / / /*

> We have been receiving notice that there are people falsely collecting information on behalf of the Green Party. As of the moment, we are still in a legal battle against the state of MT, and in such a state are not collecting, nor have we hired or asked for volunteers to collect information this 2020 cycle. . . As of now, we have no house senate or state office candidates running for the 2020 election, at least until the lawsuit reaches resolution. Any individual acting in rude or suspicious behavior claiming to be collecting information on our behalf is not affiliated with our name and mission.

*See,* Finding of Sufficiency, *Luckey v. Advanced Micro Targeting,* No. COPP 2020-CFP-004, at 3 (June 25, 2020) (hereinafter *Luckey*).

19.    Local news reporters discovered that on February 14, the Club for Growth Action, a political arm of a Washington D.C. SuperPAC, filed paperwork with the Commissioner of Political Practices (COPP) as a committee to petition to qualify a minor political party for primary elections, identifying the Green Party as the minor party. *Luckey* at 2.

20.    In response to reporters' inquiries, however, a spokesman for Club for Growth Action denied that it was behind the signature gathering efforts. *Luckey,* at 2. The spokesman told MTN News on February 13 that Club for Growth Action had explored undertaking that effort for the Montana Green Party and then decided against it.

21.    As a result, well after the circulators had finished collecting the petition signatures, Montanans still did not know who was financing the Montana Green Party petition effort.  For example, one local news report published February 13 stated "A group other than the Montana Green Party has been attempting to qualify the party for the 2020 ballot in Montana – but it's not

/////

1   clear who." In a radio interview published February 21, one local reporter posed
2   the following question to her colleague:

3       [I]n the realm of shenanigans, some unknown group has gathered
        signatures and submitted petitions around the state to qualify the
4       Green Party for the ballot, a move that is seen as possibly helping
5       Republican candidates. The Green Party in Montana says it's not
        them. And a conservative PAC, the Club for Growth, says it's not
6       them either. So who is it?
7

8       Her colleague, a local politics reporter, responded: "That's a really
9   good question that I would like to find out the answer to. . . . [H]opefully we'll
10  see some sort of paperwork filed soon to give us an idea of who's behind it."

11      22.    During the 2019 legislative session, the Montana legislature
12  passed legislation to require prompt disclosure of contributions and expenditures
13  made to petition to qualify a minor political party for primary elections. Sections
14  13-37-601 to -607. These statutes became effective October 1, 2019. Despite
15  these newly enacted statutes, Montanans did not know who was funding the
16  petition to place the Green Party on the ballot. This 2019 legislative action was
17  in response to a similar effort on the part of unknown individuals or groups in
18  2018 to petition to qualify the Montana Green Party for ballot access.

19      23.    In 2018, Advanced Micro Targeting, a Nevada political
20  consulting firm operating through thirteen paid signature gatherers, many from
21  out of state, independently collected 9,461 signatures from four counties in
22  support of the Montana Green Party petition. *Larson v. State By & Through*
23  *Stapleton*, 2019 MT 28 ¶ 4, 394 Mont. 167, 434 P.3d 241. A representative of
24  the Green Party testified that it did not commission or coordinate with this
25  eleventh-hour paid signature gathering effort and was unaware of it until learning

1   of it through news media reports. *Id.* ¶ 4 n.2. Based on the failure of Advanced
2   Micro Targeting to comply with statutory requirements applicable to political
3   party petition signatures, this Court invalidated some of the affected signatures
4   and enjoined the Secretary from affording the Montana Green Party ballot access
5   in the 2018 general election. The Montana Supreme Court, by a six to one vote,
6   affirmed this Court's decision on appeal. *Id.* ¶ 65.

7         24.    Based on the events surrounding the 2018 Montana Green
8   Party petition, MDP filed a campaign practices complaint with the COPP against
9   Advanced Micro Targeting, alleging that the firm failed to register and report
10   contributions and expenses for its electioneering activities performed through its
11   petition campaign.

12         25.    The COPP determined that Advanced Micro Targeting's
13   activities did not qualify as expenditures under then-existing Montana campaign
14   finance law. The COPP dismissed MDP's complaint. Dismissal and Sufficiency
15   Decision, *Mont. Democratic Party v. Advanced Micro Targeting*, No. COPP
16   2018-CFP-004, at 4-5 (July 20, 2018).

17         26.    As noted above, during the 2019 legislative session, the
18   Montana legislature enacted new campaign finance disclosure requirements
19   applicable to political party qualification petitions. As a result of the 2019
20   legislation, Montana law now imposes disclosure and reporting requirements on
21   efforts to petition to qualify a minor political party for primary elections similar
22   to the requirements applicable to efforts to petition to qualify initiatives and
23   referenda. *See* §§ 13-37-601 *et seq.*, MCA.
24   /////
25   /////

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

27.     Among the disclosure requirements mandated by these statutes, organizations making efforts to qualify a minor political party for primary elections using a political party qualification petition are now required to file an organizational statement with the COPP within five days of spending or receiving $500 towards the effort. § 13-37-602, MCA; § 13-37-601(4)-(7), MCA.

28.     The organizational statement is required to contain details about the minor party qualification committee, including its name and complete address, the identity of its treasurer and depository accounts, the names and addresses of its officers, and an organizational statement.

29.     No entity filed an organizational statement under § 13-37-602, MCA, as a minor party qualification committee for the petition with the COPP until February 14, after almost all the petitions had been signed.  The February 14th filing, however, still did not reveal the entity funding the petition.  Club for Growth immediately denied that it was behind the signature gathering effort. *Luckey*, at 2.

30.     According to the Secretary's pre-election calendar, the deadline for petition circulators to submit minor party qualification petitions to county elections offices was March 2nd.

31.     On March 6, the Secretary announced to county elections officials and to the media that the Montana Green Party had submitted enough signatures to satisfy the requirements of § 13-10-601, MCA.  The Secretary thus added the Green Party to the list of political parties on its website.

32.     The Secretary's announcement did not identify in which house districts the petition had exceeded the minimum required number of signatures or the number of signatures in each of those districts.

1    33.    At the time of the Secretary's announcement on March 6,

2    Montanans still did not know who was financing the Montana Green Party

3    petition effort. For example, a local news report published on March 7 stated "It's

4    unclear who paid the out-of-state signature gatherers. Montana's Green Party has

5    said it wasn't them."

6        34.    As the news began to spread in late February and early

7    March that the Montana Green Party had not sponsored the petition to qualify the

8    Montana Green Party for ballot access, and that some unknown entity was behind

9    the effort, signers began to demand that their names be removed from the

10   petition. For example, Plaintiff Blossom attempted to withdraw his signature on

11   March 6. Plaintiff Weed attempted to withdraw her signature on March 5.

12   Blossom and Weed each filled out a signature withdrawal form the same day they

13   learned that the Montana Green Party had disavowed the petition to put the Green

14   Party on the ballot and submitted it shortly thereafter.

15       35.    Montana law has long recognized the right of petition

16   signers to withdraw their names from a petition. The Montana Legislature has

17   not provided specific statutory requirements that signers of political party

18   qualification petitions must follow to withdraw their names from such petitions.

19       36.    By contrast, Montana law does specify a process by which

20   signers of petitions for constitutional amendments, calls for constitutional a

21   convention, initiatives, or referenda may withdraw their signatures: and grants to

22   the Secretary the authority to prescribe the form to be used by an elector desiring

23   to have the elector's signature withdrawn from such a petition. Section 13-27-

24   301(3), MCA. This statute does not mention political party qualification

25   petitions nor is this statute incorporated by reference in the statutes governing

1 political party qualification petitions. *Cf.*, § 13-10-601(2)(c), MCA,

2 incorporating §§ 13-27-403 through 13-27-306, MCA, for process to be used in

3 verifying signatures on a political party qualification petition.[3]

4         37.    As noted, this statutory process for withdrawals from

5 petitions for a "constitutional amendment, constitutional convention, initiative, or

6 referendum" requires the Secretary to prescribe a form for the signer to use.

7 Section 13-27-301(3), MCA.

8         38.    The statutory process for withdrawals from petitions for a

9 "constitutional amendment, constitutional convention, initiative, or referendum"

10 also provides a deadline for withdrawals. That deadline is the same day that

11 petitions for a "constitutional amendment, constitutional convention, initiative, or

12 referendum" must be submitted to county elections officials. Section

13 13-27-301(1), (3), MCA:

14        Signatures may be withdrawn from a petition for constitutional

15        amendment, constitutional convention, initiative, or referendum up
       to the time of final submission of petition sheets as provided in

16        subsection (1). The secretary of state shall prescribe the form to be
       used by an elector desiring to have the elector's signature withdrawn

17        from a petition.

18

19         39.    Based on this statutory authority, the Secretary has

20 prescribed a withdrawal form for petitions for a "constitutional amendment,

21 constitutional convention, initiative, or referendum." The withdrawal form

22 expressly states that, "Signatures may be withdrawn from a petition for

23 constitutional amendment, constitutional convention, initiative, or referendum up

24 to the time of final submission of petition sheets to the county election office." *Id.*

25

---

[3]    This shows the legislature's ability and awareness to incorporate statutes into the political party
qualification petition statutes if it desires to do so.

1    The form does not reference withdrawal of signatures from a political party
2    qualification petition.

3            40.    The withdrawal form also requires that the "signer must sign
4    in the presence of a notary public or an officer of the office where the form is
5    filed." *Id.* However, the statute authorizing the Secretary to prescribe such a
6    form for withdrawals from petitions for a "constitutional amendment,
7    constitutional convention, initiative, or referendum" does not mention a
8    requirement that the form be notarized or signed in person in the presence of an
9    election official. *Cf.,* § 13-27-301(3), MCA.

10           41.    The Secretary did not present, and the Court cannot find,
11   evidence that the Secretary's withdrawal form was prescribed through an
12   administrative rulemaking process, pursuant to § 2-4-302, MCA.

13           42.    Unlike § 13-27-301, MCA, governing the withdrawal of
14   signatures from a petition for a constitutional amendment, constitutional
15   convention, initiative, or referendum, no statute grants the Secretary authority to
16   prescribe a form for withdrawing from political party qualification petitions.
17   Austin James, as chief staff attorney for the Secretary, advised the Secretary that
18   § 13-27-301(3) was not relevant to signature withdrawal from a political party
19   qualification petition because the statutes expressly referenced by the political
20   party qualification statute do not include Section 13-27-301, MCA.

21           43.    Section 13-10-601(2)(a) directs and grants the Secretary the
22   authority to prescribe a form for petition circulators to use when gathering
23   signatures for a political party qualification petition. The Secretary has
24   prescribed such a form. That petition form does not require that a petition signer
25   sign in the presence of a notary or county elections official.

1           44.    Nevertheless, the Secretary believed that petition signers

2   who wanted to withdraw their names from the Green Party qualification petition

3   must use the withdrawal form applicable to petitions for a constitutional

4   amendment, constitutional convention, initiative, or referendum.  The Secretary's

5   election director testified that if a petition signer wishing to withdraw his or her

6   signature submitted a different form or submitted a withdrawal form that was not

7   notarized or signed by a county elections official, it would not be honored.

8           45.    The Secretary has not prescribed any administrative rule or

9   issued any publicly accessible statement of policy regarding withdrawals from a

10   political party qualification petition.  Likewise, the Secretary has not promulgated

11   through administrative rulemaking a form for a signer of a political party

12   qualification petition to use to withdraw their signature from such a petition.

13           46.    The Secretary did not notify the public or issue any publicly-

14   accessible statement regarding the Secretary's belief that petition signers who

15   wanted to withdraw their names from the Green Party qualification petition must

16   use the withdrawal form, or that if they submitted a different form, or submitted a

17   withdrawal form that was not notarized or signed by a county elections official, it

18   would not be honored.  The Court has not found or been directed to any statute,

19   administrative rule, or public policy statement from the Secretary in support of

20   these positions of the Secretary.

21           47.    The Secretary did not notify the public or issue any publicly

22   accessible statement regarding the Secretary's belief that the deadline for signers

23   of political party qualification petitions to withdraw would be at the moment the

24   Secretary determined sufficiency and that the Secretary would not honor

25   withdrawal requests received after that moment.  The Court has not found or

1  been directed to any statute, administrative rule, or public policy statement from
2  the Secretary in support of these positions of the Secretary.

3  48.   The Secretary did not notify the public in advance or issue
4  any publicly-accessible statement that he would on March 6, 2020 make a
5  determination of sufficiency for the Green Party petition or that he would refuse
6  to accept any signature withdrawal forms that were submitted after that moment.
7  The Court has not found or been directed to any statute, administrative rule, or
8  public policy statement from the Secretary in support of these positions of the
9  Secretary.

10  49.   The Secretary did not notify the public or issue any publicly
11  accessible statement that the Secretary believed that a petition withdrawal request
12  that is electronically signed is not valid and would not be honored.  The Court has
13  not found or been directed to any statute, administrative rule, or public policy
14  statement from the Secretary in support of this position of the Secretary.

15  50.   Regarding the Secretary's foregoing determinations as to
16  processes for the withdrawal of a petitioner signer's signature, the Secretary did
17  not provide any opportunity for public input or participation prior to adopting
18  these various determinations.

19  51.   On March 3, 2020, the same day the Secretary's Elections
20  Director received a legal memorandum from the Secretary's chief counsel
21  regarding signature withdrawal from a minor party petition, the Director sent an
22  email to county elections officials on that topic, revising prior guidance:
23  /////
24  /////
25  /////

1
2
3
4

> There are questions about if an election office can accept a request from a signer of a petition to withdraw their signature. Yes, in reviewing this, any person signing the petition has the right to withdraw at any time before the person or body created by law to determine the matter submitted by the petition has finally acted.

5
6
7
8
9
10
11
12
13

52.     The Director's March 3 email, however, did not identify the Secretary as "the person or body created by law to determine the matter submitted by the petition." Likewise, the Director's March 3 email did not identify the Secretary's act of announcing that a political party qualification petition contained a sufficient number of signatures as "the time the person or body created by law to determine the matter submitted by the petition has finally acted." The Director's March 3 email also did not contain any statement regarding the Secretary's belief that the deadline for signers of political party qualification petitions to withdraw their signatures was March 6, 2020.

14
15
16
17
18

53.     The Director's March 3 email contained instructions for the process for withdrawals, including an instruction to time stamp withdrawal forms as they arrived in county election officials' offices, and that if there were no date stamp, to determine the arrival date of the form with the best data available to the county election official.

19
20
21
22
23
24
25

54.     The Director's March 3 email did not instruct county elections administrators to review withdrawal forms for completeness or compliance with any specific requirements. For example, the March 3 email did not contain any instructions regarding whether a withdrawal form must be signed, or what kinds of signatures are acceptable. The March 3 email did not instruct county elections administrators to compare a signature on a withdrawal form to a voter's signature on file with the county elections office. *See,* § 13-27-303,

1  MCA, incorporated into political party qualification statute, requiring local

2  county election officials to check the names and signatures of petition signers

3  against county registration records of the office.

4         55.    The March 3 email was not made public until July 14, when

5  the Secretary disclosed it as an exhibit in this action.

6         56.    The Secretary's March 3 internal memorandum from

7  attorney Austin James opined that Section 13-27-301, MCA, which sets out the

8  statutory process for withdrawals from petitions for a "constitutional amendment,

9  constitutional convention, initiative, or referendum," is "not a relevant statute

10  regarding signature withdrawal from a political party qualification petition"

11  because the statutes expressly referenced by the political party qualification

12  statute do not include Section 13-27-301, MCA.

13         57.    Section 13-27-308, MCA, provides:

14        When a petition for referendum, initiative, constitutional

15        convention, or constitutional amendment containing a sufficient
      number of verified signatures has been filed with the secretary of

16        state within the time required by the constitution or by law, the
      secretary of state shall immediately certify to the governor that the

17        completed petition qualifies for the ballot.

18

19         This statute does not refer to §§ 13-10-601 through -605, MCA,

20  the political party qualification statutes, nor do the political party qualification

21  statutes refer to or incorporate this statute, regarding certification of a petition to

22  the governor. No statute provides that, for a political party qualification petition,

23  the Secretary is delegated authority to "certify to the governor" that a minor party

24  qualification petition meets the threshold to get on the primary ballot.

25  /////

1    58.    The Secretary did not introduce evidence that he certified to

2    the Governor that the political party qualification petition "qualifies for the

3    ballot."

4    59.    The Secretary's March 3 internal memorandum was not

5    made public until July 14, when the Secretary disclosed it as an exhibit in this

6    action.

7    60.    On March 24, more than two weeks after the Secretary

8    announced on March 6 the petition contained enough valid signatures, it was

9    revealed for the first time that the group funding the circulation of the petition

10   was the MTGOP.  One local news report published on March 24 stated: "A

11   mystery of the 2020 election was solved Tuesday as it became clear the MTGOP

12   paid for an effort to qualify the Montana Green Party for the ballot this election."

13   Ex. 16, at 1.

14   61.    Local reporters uncovered that the MTGOP Central

15   Committee contracted directly with a Texas-based petition signature gathering

16   firm, Advanced Micro Targeting, to hire paid circulators to gather signatures for

17   the petition. As the COPP later found, the MTGOP Central Committee made an

18   expenditure of $50,000 to Advanced Micro Targeting on January 21. *Luckey,*

19   pp. 1-2.

20   62.    The MTGOP Central Committee did not file an organization

21   statement as a minor party qualification committee with the COPP within five

22   days of spending $50,000 towards the effort, as required by §§ 13-37-602, and

23   § 13-37-601(7), MCA. *Luckey,* p. 4.

24   /////

25   /////

1    63.    Instead, on January 24, an entity called Montanans for

2 Conservation filed an organization statement with the COPP. Montanans for

3 Conservation did not file an organization statement as a minor party qualification

4 committee. Rather, it filed an organization statement as an independent political

5 committee with the COPP. *Luckey*, p. 2. On February 3, Montanans for

6 Conservation amended its organization statement. The amendment added a

7 statement that the committee "would serve as the minor party qualification

8 committee to qualify the Montana Green party to hold primary elections in

9 Montana." The amendment did not request a committee status change from an

10 independent committee to a minor party qualification committee. *Luckey*, p. 2.

11    64.    By registering as an independent political committee instead

12 of a minor party qualification committee, Montanans for Conservation concealed

13 its role in funding the petition. There are hundreds of independent committees

14 listed in the COPP's Campaign Electronic Reporting System database. By

15 contrast, there are only two minor party qualification committees listed in the

16 database. If an individual had at the time filtered the records in the Campaign

17 Electronic Reporting System to show only minor party qualification committees,

18 he or she would not have discovered the Montanans for Conservation filing.

19    65.    It was not until March 23, seventeen days after the

20 Secretary's March 6, announcement, that Montanans for Conservation filed

21 another amended organization statement to change its committee type from

22 independent committee to minor party qualification committee. *Luckey*, p. 2.

23 The next day, local reporters ran articles revealing that Montanans for

24 Conservation was the entity serving as the minor party qualification committee

25 for the petition, and that the MTGOP Central Committee was the entity that

1    contracted with and paid Advanced Micro Targeting to gather signatures for the

2    Green Party Qualification Petition.

3         66.    The only contributions to Montanans for Conservation were

4    a cash contribution of $800 from the MTGOP Central Committee to set up the

5    committee, and an in-kind contribution from the MTGOP Central Committee of

6    $100,000 for hiring Advanced Micro Targeting. *Luckey*, p. 4. No other entity

7    contributed to Montanans for Conservation. *Id.*

8         67.    Because the MTGOP Central Committee was the entity that

9    contracted directly with Advanced Micro Targeting to gather signatures on the

10   petition, the sole purpose of Montanans for Conservation was to serve as a shell

11   group to which the MTGOP Central Committee could attribute its expenditures.

12   This enabled the MTGOP Central Committee to avoid having to register as the

13   minor party qualification committee within five days of expending funds on

14   petition signature gathering activities.

15        68.    COPP later determined that Montanans for Conservation,

16   the MTGOP, and Club for Growth Action, violated Montana's campaign finance

17   law. *Luckey*, p. 8-10. COPP found that Montanans for Conservation failed to

18   timely file as a minor party qualification committee as required by Section 13-37-

19   602, MCA. *Id.* According to the COPP, this delay in reporting its efforts in

20   violation of Montana law "added to the confusion surrounding the Green Party

21   qualification effort in February and March of 2020." *Luckey*, p. 8.

22        69.    As confusion proliferated over the Green Party petition

23   effort, MDP mobilized to inform signers that an unknown entity unaffiliated with

24   /////

25   /////

the Montana Green Party—eventually revealed to be the MTGOP—was behind the petition, and assisted signers who wanted to withdraw their names from the Petition.

70.     To determine who had signed the petition, and the number of signatures on the petition and in each house district, MDP downloaded from the Secretary's website a copy of the Petition Signers Report. The Secretary's website describes the Petition Signers Report as "a county-by-county record of a specific petition's signers" and contains fields for each signer, including the signer's "County, Submittal Number, Sheet, Line, Voter ID, Name, Residence, Status, Verification Reason (if the signature was rejected, the rejection reason selected by the county is included), House District, and Circulator."

71.     It was difficult for MDP to reach signers of the petition. MDP did not have email addresses, cell phone numbers or phone numbers for many signers. Many phone numbers and addresses were incorrect or out of date.

72.     When MDP organizers were able to reach signers and inform them that the Montana Green Party was not involved in the petition, and that the backers of the petition were unknown, some signers wanted to withdraw their names from the petition.

73.     When it was revealed on March 24 that the MTGOP had sponsored, organized, and paid for the circulation of the petition, there was a significant increase in the number of signers who took steps to withdraw from the petition. Four times as many signers sought to withdraw in the first two weeks after March 24 as compared to the two weeks prior.

/////

/////

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

74.    Many signers reached by MDP were surprised to learn that the MTGOP was behind the Petition and that the Montana Green Party had nothing to do with the petition. For example, until she was reached by MDP in April, Plaintiff Neumeyer was not aware that the MTGOP had any involvement in the Petition.

75.    Although MDP did not believe it was necessary for signers of a political party qualification petition attempting to withdraw their signature to complete the withdrawal form for signers of "constitutional amendment, constitutional convention, initiative, or referendum" petitions,[4] MDP advised signers that county elections officials would likely accept that form, and took steps to assist signers in completing and submitting such forms.

76.    The withdrawal form states that it should be signed in the presence of a county elections official or a notary. Although some signers were able to make the trip to their county elections office to sign the form or were able to arrange a meeting with a notary to get the form notarized and submitted, for other signers, these steps were burdensome. MDP attempted to assist where possible by arranging for a notary to meet such signers at a convenient location

77.    Shortly before the Governor issued the stay-at-home order in response to the COVID-19 pandemic, signers who wanted to withdraw their signatures told MDP organizers that they were unable or unwilling to travel to a county elections office or meet with a notary because of concerns about maintaining social distancing and attempting to eliminate non-essential travel.

78.    MDP also arranged for online notary services for signers. Those services, however, require a computer, a high-speed internet connection,

---

[4]    This is consistent with the opinion of the Secretary's chief counsel that the withdrawal form for constitutional amendment, constitutional convention, initiative, or referendum was not relevant to withdrawing of signatures on a political party qualification petition, a conclusion with which the Court agrees.

Findings of Fact, Conclusions of Law, and Order – page 22
DDV-2020-856

1    video conferencing capability, installing software, and navigating the software's
2    user interface.

3         79.    The online notary solution proved difficult and cumbersome
4    for some signers, especially elderly voters who were unfamiliar with the
5    technology.  For some signers, the online notary solution did not work at all; for
6    others, it took up to forty-five minutes to work.

7         80.    Because the online notary service was not an option for
8    many signers, and because MDP did not want to encourage signers to risk their
9    health by venturing out, MDP set up a process that allowed signers to complete
10   the withdrawal form electronically from their computers or smartphones and sign
11   the document using the electronic document signature platform DocuSign.

12        81.    DocuSign collects and records information about the signer
13   and the signature, including the signer's email address, the signer's IP address,
14   and the date and time the document was transmitted, opened, and signed.
15   DocuSign collects the same information about the sender of the document—in
16   this case, the name, email address, and IP address of the MDP organizer who sent
17   a copy of the DocuSign withdrawal form to the signer of the petition.  After the
18   signer affixes an electronic signature to a PDF, the document is assigned a unique
19   identifying code that allows for subsequent audits.  DocuSign also provides an
20   electronic copy of the signed document to the signer for their records.

21        82.    MDP would receive copies of the electronically signed
22   withdrawal forms from the signers and transmit them to county elections offices
23   by email in batches.

24   /////
25   /////

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

83.    Plaintiff Neumeyer completed and signed a withdrawal form via DocuSign on April 28, and MDP transmitted her form to the Lewis and Clark County elections department on May 4.

84.    Plaintiff Filz did not testify at the hearing. According to Bolger and Miller, Filz completed and signed a withdrawal form on DocuSign on April 3, and MDP transmitted his form to the Yellowstone County elections department on April 13. The Secretary claims it did not receive a withdrawal form from the Yellowstone County elections department on behalf of Filz.

85.    MDP was not informed by any county elections official that the official would not accept DocuSign withdrawal forms because they were electronically signed. Expressed differently, MDP was not informed by any county elections official that withdrawal forms must have a "wet" signature.[5] Similarly, MDP was not informed by the Secretary that it would not accept DocuSign withdrawal forms because they were electronically signed. Likewise, the Secretary did not inform MDP or anybody who submitted a signature withdrawal form of any requirement that withdrawal forms must have a "wet" signature.

86.    On April 13, the Yellowstone County Election Administrator stated that he was forwarding MDP's transmission of withdrawal forms with electronic signatures to the Secretary. On May 13, the Lewis & Clark County Election Administrator stated that she was sending MDP's transmission of withdrawal forms with electronic signatures to the Secretary.

/////

---

[5]    A 'wet ink' signature is where the parties to the document write (sign) their names with their own hands upon a paper document by ink pen. Although some specific types of legal documents do still have to be signed by the traditional 'wet ink' method, most documents including commercial contracts can be signed by electronic signature." https://www.nextgearcapital.co.uk/help-centre/how-to-use-docusign/what-is-the-difference-between-an-electronic-signature-and-a-wet-ink-signature/

Findings of Fact, Conclusions of Law, and Order – page 24
DDV-2020-856

1        87.    On May 4, 2020 and again on May 22, 2020, at the request

2 of the Missoula County Election Administrator, MDP sent withdrawal forms with

3 electronic signatures directly to the Secretary.

4        88.    The Secretary's Petition Signers Report identifies each

5 signer of the petition and whether the Secretary accepted and counted a signature

6 towards the total number of verified signatures of registered voters required from

7 each house district.

8        89.    The Petition Signers Report identifies 116 signatures the

9 Secretary rejected and did not count towards the total number of verified

10 signatures because the signer withdrew his or her signature.

11        90.    The Petition Signers Report indicated that the signatures of

12 Plaintiffs Blossom, Filz, Neumeyer, and Weed were among the signatures

13 accepted and counted towards the total number of required signatures.

14        91.    The Petition Signers Report indicates that the Petition

15 exceeded the required number of accepted signatures in forty-two house districts,

16 including house districts 46, 53, 54, 68, 69, 80, 84, 96, and 97.

17        92.    By late May, over 500 signers of the petition who were

18 marked in the Petition Signers Report as accepted and counted towards the

19 required number of accepted signatures had submitted requests to withdraw their

20 signature.  MDP obtained copies of withdrawal forms submitted to counties and

21 to the Secretary through public records requests and by retaining copies of

22 withdrawal forms that MDP transmitted to counties or to the Secretary on

23 signers' behalf.

24        93.    All but ten of these withdrawal forms were received by

25 county elections offices no later than June 1, as demonstrated either by a stamp or

1  notation placed on the form, by the date that MDP transmitted the forms to the
2  counties, or based upon metadata contained in the documents produced by
3  counties and the Secretary in response to MDP's public records requests. Ten
4  additional withdrawal forms were received by county elections offices no later
5  than June 12.

6    94. After accounting for the withdrawal forms set out in
7  Plaintiffs' Exhibits 4 and 5, the Petition contains signatures above the thresholds
8  set by the Political Party Qualification Statute in no more than 33 House
9  Districts, as set forth in Plaintiffs' Exhibit 7:

| House District | Signatures Required | Signatures Accepted by Secretary (Petition Signers Report) | Signatures Withdrawn | Remaining Signatures Accepted by Secretary |
|---|---|---|---|---|
| 46 | 138 | 161 | At least 29 | At most 132 |
| 53 | 129 | 160 | At least 36 | At most 124 |
| 54 | 130 | 166 | At least 46 | At most 120 |
| 68 | 106 | 136 | At least 43 | At most 93 |
| 69 | 109 | 141 | At least 39 | At most 102 |
| 80 | 132 | 180 | At least 53 | At most 127 |
| 84 | 150 | 208 | At least 74 | At most 134 |
| 96 | 150 | 229 | At least 91 | At most 138 |
| 97 | 138 | 195 | At least 68 | At most 127 |

  95. Plaintiffs' Exhibit 7 uses the number of signatures withdrawn
based on withdrawal forms received by county elections offices or the Secretary
no later than June 12. If the chart used the number of signatures withdrawn based
only on withdrawal forms received by county elections offices or the Secretary no
later than June 1, the conclusion would not change: the petition contains
/////

1  signatures above the thresholds set by the political party qualification statute in no

2  more than 33 House Districts.

3        96.   As conceded by counsel for the Secretary in closing

4  argument, if the Court determines that all the withdrawal requests contained in

5  Plaintiffs' Exhibit 5 should be given effect, the petition does not meet the

6  statutory threshold for qualification.

7        97.   Kendra Miller, the former data director of MDP, obtained

8  and relied upon Petition Signers Reports for numerous petitions in the past.

9        98.   In 2018, in *Larson v. State By & Through Stapleton*,

10 2019 MT 28 ¶ 4, 394 Mont. 167, 434 P.3d 241, MDP requested a copy of the

11 Petition Signers Report for the 2018 Green Party petition, and introduced into

12 evidence numerous exhibits that expressly relied upon the data in the Petition

13 Signers Report. *See, e.g.*, Apr. 24, 2018 Hrg. Tr. 48:20-66:10, *Larson et al v.*

14 *Stapleton*, CDV 2018-295 (1st Jud. Dist. Ct. 2018).  Counsel for the Secretary in

15 the *Larson* case did not object to the introduction of these exhibits based upon

16 Petition Signers Report data.  Nor did the Secretary reveal that the Petition

17 Signers Report was not the record of the petition's signers, and that a different

18 record maintained by the Secretary contained the true record of the petition's

19 signers.  Corson, testifying on behalf of the Secretary in the *Larson* case, did not

20 testify that the Petition Signers Report was not the record of the petition's

21 signers, or that a different record maintained by the Secretary's office contained

22 the record of the petition's signers. In rendering their decisions in *Larson*, this

23 Court and the Montana Supreme Court relied upon those exhibits containing data

24 from the Petition Signers Report.

25 /////

1

2

3

4

5

99.   MDP first obtained a copy of the Petition Signers Report for the Green Party petition from the Secretary on March 12 and relied on it to determine how many withdrawal forms had not been honored by the Secretary and to calculate the effect on the Green Party petition's sufficiency if those withdrawals were honored.

6

7

8

9

10

11

12

100.   During the July 14-15 evidentiary hearing, Elections Director Corson, testifying on behalf of the Secretary, stated for the first time that the Petition Signers Report was not the official record of the signers of the petition. Corson testified that the Secretary used a different decisional document to record the signers of the petition and whether their signatures were accepted or rejected, and to determine whether the petition contained a sufficient number of signatures under the political party qualification statute.

13

14

15

16

17

18

101.   The Petition Signers Report indicates that Plaintiffs Weed's and Blossom's signatures were accepted and counted towards the thresholds set by the political party qualification statute in their House Districts. Elections Director Corson testified that withdrawal forms submitted by Weed and Blossom were received, and that their signatures were not counted towards the thresholds. Corson testified that the separate decisional document reflected this disposition of Weed's and Blossom's withdrawal forms.

19

20

21

102.   The Secretary did not produce this separate decisional document to MDP in response to their public records request for the Petition Signers Report.

22

23

24

25

103.   Until the July 14 evidentiary hearing, the Secretary had not informed MDP or the general public that a separate decisional document contained the record of the signers of the petition and whether their signatures

/////

1    were accepted or rejected.  The Secretary did not offer this separate decisional

2    document as an exhibit.  The document is not part of the record before the Court.

3          104.  Director Corson submitted a chart purporting to contain the

4    number of accepted signatures in each house district. Plaintiffs' Exhibit 1

5    compares the number of accepted signatures in each house district as set forth in

6    Director Corson's chart with the number of accepted signatures set forth in the

7    Petition Signers Report.  In twelve house districts, Corson's chart records fewer

8    accepted signatures than the Petition Signers Report. In one house district,

9    Corson's chart records more accepted signatures than the Petition Signers Report.

10         105.  Plaintiffs' Exhibit 7 uses the number of signatures marked as

11   accepted by the Secretary's Petition Signers Report. If Exhibit 7 instead used the

12   number of signatures marked as accepted on the Corson chart, the conclusions

13   would not change: the petition contains signatures above the thresholds set by the

14   political party qualification statute in no more than thirty-three House Districts.

15         106.  After filing an emergency request to continue the hearing,[6]

16   the Secretary purported to compile records of withdrawal forms in his possession

17   at the time and attempt to determine the effect of honoring such withdrawal

18   forms.  The Secretary's compilation, however, did not include all the withdrawal

19   forms that had been submitted to county elections offices.[7] The Secretary's

20   compilation purported to analyze the effects by house district, but the tabulation

21   is inaccurate because the Secretary relied on current address information rather

22   than address information at the time of petition signing and did not assign all

23   individuals to a house district.  The Secretary did not provide the Court with the

24   underlying withdrawal forms on which his tabulation is based.

25

---

[6]    To be clear, the Court does not dispute that the Secretary's emergency motion to continue the hearing was filed in good faith.

[7]    Corson testified that the Secretary could not count withdrawal forms it had not received. While this is true, the Secretary had advised county election officials that withdrawals received after March 6 should not be counted.

Findings of Fact, Conclusions of Law, and Order – page 29
DDV-2020-856

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

107.   At least 562 signers of the Petition submitted requests to withdraw their signature that the Secretary has not honored, according to the Petition Signers Report.

108.   The Secretary's failure to honor signers' requests to withdraw their signature injures these signers because their signatures are being counted in support of a petition that they no longer wished to support, as demonstrated by their submission of requests to withdraw their signature.

109.   The Secretary's failure to honor signers' requests to withdraw their signatures also injures these signers because they continue to be associated with a petition and a petition sponsor with whom they no longer wish to be associated.  For example, Plaintiffs Neumeyer, Weed, and Blossom testified they are not supporters of the MTGOP, do not support a petition whose purpose is harming the Democratic Party, and do not want to be associated with the MTGOP or its efforts relative to the petition.

110.   If the Green Party qualifies for ballot access pursuant to the Petition, MDP would be harmed both financially and electorally.  MDP would be harmed financially because it would need to spend additional funds on voter persuasion, voter education, and polling, and would have to expend additional time and resources to address an additional swath of center-left voters.  MDP would be harmed electorally because voters who might otherwise vote for MDP candidates might vote instead for Green Party candidates.

111.   MDP's mission is to elect Democratic Party candidates in local, county, state, and federal elections.  MDP works to accomplish this mission through its efforts to educate, persuade, mobilize, assist, and turn out voters throughout the state.

1    112.   In past elections, MDP expended millions of dollars to
2    persuade and mobilize voters to support candidates who affiliate with the
3    Democratic Party in Montana. MDP again intends to make substantial
4    expenditures to support Democratic candidates in the 2020 general election and
5    in future elections.

6    113.   If candidates nominated in the primary election for the
7    Green Party as a result of the petition are given ballot access in the 2020 General
8    Election, MDP will incur additional expenditures and will divert resources from
9    other MDP priorities.

10    114.   These expenditures and diversions of resources would be
11    caused by the need for MDP to educate voters about the differences between
12    candidates from the Democratic Party and candidates nominated in the Green Party
13    primary, and to persuade voters to vote for candidates from the Democratic Party
14    over candidates nominated in the Green Party primary.

15    115.   For example, MDP will need to calibrate their internal voter
16    file differently to target a different ideological area of the universe of voters MDP
17    needs to reach to convince them to vote for MDP candidates.  This is not
18    something that MDP has planned for and would require MDP to spend money and
19    time to address.

20    116.   MDP would also need to contact more voters for persuasion,
21    which in turn requires more volunteers, staff, and campaign materials. MDP would
22    need to put out more expensive and more complicated polling to determine which
23    kinds of voters to target and what kinds of messages to use. All these efforts cost
24    money, and MDP would need to devote additional time and effort to fundraising to
25    accomplish them.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

From the foregoing findings of fact, the Court draws the following:

**CONCLUSIONS OF LAW**

1.    The Court has jurisdiction to grant declaratory and injunctive relief pursuant to the Montana Uniform Declaratory Judgments Act, Section 27-8-101 *et. seq.* MCA, and Sections § 27-8-201 *et seq.*, MCA, which authorize the Court to declare rights, status, and other legal relations among the parties. *See Larson*, ¶ 31.

2.    As a court of general jurisdiction, this Court has authority to hear Plaintiffs' claims under the Montana Constitution. *See* Section 3-5-302, MCA.

3.    The Court has subject matter jurisdiction to determine the validity of a political party qualification petition, like this one. *Larson*, ¶ 43.

4.    MDP has standing to assert the claims in the Complaint because it is injured by the Secretary's failure to give effect to Montanans' withdrawal requests seeking to remove their names from the Petition. Allowing the Montana Green Party to qualify under the political party qualification statute, and thus obtain primary and general election ballot access, when it has not shown sufficient support as required by statute, would result in MDP having to expend additional funds and resources to educate and persuade voters to support Democratic candidates over candidates claiming to be affiliated with the Montana Green Party in the 2020 general election. *See Larson*, ¶ 43.

5.    MDP also has standing to assert the claims in the Complaint because MDP, which performs the functions of a membership organization by providing the means by which Democratic voters in Montana express their collective views and protect their collective interest, is harmed because some of

1  its members or associates, including but not limited to Plaintiffs Blossom,

2  Neumeyer, and Weed, are injured by being forced to associate with a petition of a

3  political party with which they never wanted to be associated and by being

4  deprived of their right to withdraw their names from that petition.

5        6.     Plaintiffs Blossom, Neumeyer, and Weed have standing to

6  assert the claims in the Complaint because they will suffer a concrete injury by

7  being forced to be associated with a petition organized and funded by a political

8  party with which they do not want to be associated, and by being deprived of

9  their right to withdraw their names from the petition.

10        7.     Montanans have the right to withdraw their signatures from

11  a petition. *State ex rel. Lang v. Furnish*, 48 Mont. 28, 36, 134 P. 297, 300 (1913)

12  ("signers of a petition have an absolute right to withdraw therefrom at any time

13  before final action thereon"); *See also Ford v. Mitchell*, 103 Mont. 99, 61 P. 2d

14  815, 822 (1936) ("[T]he signers of an initiative petition may, in an appropriate

15  manner and at the proper time if they so desire, withdraw from such petition.").

16  The Montana Supreme Court has described this longstanding right as "a

17  necessary inference from the very nature of the right of petition." *Lang*, 134 P.

18  at 300.

19        8.     Pursuant to this right, individuals can withdraw their

20  signature so long as: (1) there is no express legal prohibition on doing so; and (2)

21  individuals withdraw before final action is taken on a petition. *Lang,* 134 P. at

22  300; *Ford*, 61 P. 2d at 821 (finding right to withdraw in the absence of "an

23  express sanction or prohibition of withdrawals").

24        9.     Even after final action is taken on a petition, signers may

25  still withdraw if signers learn that representations made to them as an inducement

to sign the petition, and on which they relied, were false. *State ex rel. Peck v. Anderson*, 92 Mont. 298, 306, 13 P.2d 231, 234 (1932).

        10.    The statutes governing political party qualification petitions do not contain any express prohibition against persons who have signed the petition from withdrawing their signatures.

        11.    The statutes governing political party qualification petitions do not define what constitutes final action for the purposes of those statutes. Nor do those statutes confer any express authority on the Secretary to certify that a minor political party has submitted sufficient signatures to qualify for the general ballot. This contrasts with the statute governing petitions for initiatives, referenda, constitutional amendments, or calls for constitutional conventions. Section 13-27-308, MCA, provides that the Secretary, after tabulating signatures for a "petition for referendum, initiative, constitutional convention, or constitutional amendment," "shall immediately certify to the governor that the completed petition qualifies for the [general election] ballot." This statute, by its plain terms, does not apply to political party qualification petitions. Although the political party qualification statutes incorporate by reference certain statutes applicable to ballot issues, Section 13-27-308, MCA is not among those statutes. *See* Section 13-10-601, MCA. The political party qualification statute makes no mention of certification by the Secretary, to the Governor or to anybody else, and no other statute delegates certification authority to him.

        12.    The process by which a political party not otherwise eligible for listing on the primary ballot under § 13-10-601(1), MCA, defines only a process by which a "minor" political party may nominate its candidates by a primary election. The statute is silent as to the general election. The purpose of

1    this statute is thus different than that for approval of an initiative, referendum,

2    constitutional amendment, or constitutional convention.  In these latter petitions,

3    the proposed change to statute or constitution is to be voted on by the electorate

4    at the general election.  Initiatives, referenda, constitutional amendments, or

5    constitutional conventions are placed directly upon the general election ballot so

6    long as proponents submit enough valid signatures by the deadline—there is no

7    requirement to first go through a primary election or to take any other

8    preliminary steps.  *See* Mont. Const. art. III, § 4.  Once the Secretary certifies to

9    the Governor that the initiative petition qualifies for the ballot, Section

10   13-27-308, MCA, there are no other procedural steps or contingencies that must

11   occur before all voters are afforded the right to vote on the initiative.

12              13.    Political party qualification petitions serve a different

13   function than initiative· referenda, constitutional amendments, and constitutional

14   conventions petitions.  Final action for purposes of an initiative petition is not the

15   same as final action for purposes of a political party qualification petition.  The

16   unique characteristics of petitions for political party qualification in Montana

17   compel the conclusion that action on such a petition is not final until votes have

18   been cast and canvassed in the primary election and certificates of nomination

19   have issued.

20              14.    Filing a political primary qualification petition is one of

21   several initial steps in a process through which voters decide whether a political

22   party's candidates in a primary election will obtain ballot access in the general

23   election.  Primary election voters make the ultimate decision whether to nominate

24   candidates for office through this procedure, and the state canvassing board,

25   which counts votes and issues certificates of nomination based on those votes, is

1   "the person or body created by law to determine the matter submitted by the

2   petition[.]" *See State ex rel. O'Connell v. Mitchell*, 111 Mont. 94, 106 P.2d 180,

3   181 (1940) (citing *Ford*, 61 P.2d 815).

4         15.   The filing of a political party qualification petition with the

5   Secretary simply initiates this multi-step procedure that a party's voters may use

6   to determine who to nominate, but no right to ballot access is acquired until

7   primary votes have been cast and counted for candidates running for a party's

8   nomination. Accordingly, no final action is taken on the petition until that time.

9   *See Town of Blooming Grove v. City of Madison*, 253 Wis. 215, 33 N.W.2d 312

10   (1948). (Holding that tabulation of the signatures on a petition was a necessary

11   step in a process that concluded with a vote on the ordinance proposed by the

12   petition, but the court held that no final action had occurred, and no rights were

13   acquired by anyone, until the vote on the ordinance was finally taken).

14         16.   The Secretary's tabulation of the number of signatures on a

15   political party qualification petition and announcement that the petition meets the

16   requirements of the political party qualification statute confers no right to

17   placement on the general election ballot. No statute so holds. The act of

18   submitting a political party qualification petition simply authorizes a political

19   party to use the state-administered procedure of a primary election to determine

20   whether to nominate candidates and which candidates to nominate.

21         17.   Many other procedural requirements and contingencies must

22   first be met before a primary election can even take place: candidates for the

23   nomination of the political party must: (1) timely file a declaration of nomination,

24   Section 13-10-201, MCA; (2) not die or withdraw their candidacies, Section

25   13-10-326, MCA; (3) maintain their constitutional and statutory eligibility for the

1    offices in question, Section 13-12-201(3), MCA; and (4) file certain campaign

2    finance and business disclosure statements and reports, Section 13-37-126, MCA.

3              18.    In addition, candidates for a nomination must stand for

4    primary election and receive voters from electors; the act of seeking a party's

5    nomination has no legal significance until votes are canvassed and counted and

6    until certificates of nomination are issued. Section 13-15-507, MCA (state

7    canvassing board declares nominated the individual having the highest number of

8    votes); *see also* Section 13-10-303, MCA (providing that candidates nominated

9    by more than one party must choose one party or appear on the general election

10   ballot without a party designation).

11             19.    Montana statutes do not support the Secretary's claim that

12   he has the authority to "certify" a political party qualification petition to the

13   Governor, or that his act of determining and announcing sufficiency constitutes

14   final action on the petition. A political party qualification petition confers no

15   access to the general election ballot without additional procedural steps and

16   contingencies. The Secretary could not have certified to the Governor that the

17   petition "qualifies for the ballot," like an initiative petition or referendum would.

18             20.    To illustrate the issue, if a petition is submitted and a

19   primary election is held for which no qualified person[8] received any votes, would

20   defeat the petition and the party would have no right to appear on the general

21   election ballot. The Court concludes that under the unique procedures applicable

22   to petitions for political party qualification, it is not until the Board of State

23

24

25   [8]    There is evidence before the Court that the Montana Green Party disavowed the signature gathering process
     and has also disavowed the persons filing under the Green Party banner as not being true Green Party members or
     adherents. *See,* § 13-10-602(1), MCA: "(1) Except as provided in subsection (3), a political party and its regularly
     nominated candidates, members, and officers have the sole and exclusive right to the use of the party name. A
     candidate for office may not use any word of the name of any other political party or organization other than that
     by which the candidate is nominated in a manner that indicates or implies the individual is a candidate of the
     nonnominating party."

1   Canvassers tabulates the votes that the process is final. Until that date, there is no
2   final action on the petition. Therefore, the withdrawal requests at issue here—
3   nearly all submitted prior to the June 2, 2020 primary election, and all before
4   June 12, 2020—must be given effect because they were submitted to officials
5   before final action was taken on the political party qualification petition.

6           21.    Even assuming that the Secretary had authority to take "final
7   action" on a political party qualification petition under some circumstances, the
8   evidence at trial revealed that the Secretary's actions in connection with the
9   petition, which were not revealed to the public, cannot constitute final action.

10          22.    Article II, § 8 of the Montana Constitution requires that
11  government agencies conduct a transparent process that allows for public input
12  "prior to the final decision." Mont. Const. Art. II, § 8. *Bryan v. Yellowstone Cty.*
13  *Elementary Sch. Dist. No. 2*, 2002 MT 264, ¶ 39, 312 Mont. 257, 269, 60 P.3d
14  381, 390 (discussing "the constitutional mandate on open government.").

15          23.    The Secretary has purported to issue "final action" on the
16  petition without first announcing his cutoff date or the procedural requirements
17  applicable to withdrawals, and without disclosing, even to this Court, the data
18  underlying his decision, despite knowing that such data was squarely at issue in
19  this litigation. The Secretary also announced for the first time during this case, in
20  a motion for summary judgment, that he has a policy forbidding electronic
21  signatures on petition withdrawal forms.

22          24.    While the Montana Supreme Court has not definitely
23  resolved what "final action" generally means in the context of a political party
24  qualification petition, it cannot be what the Secretary contends it is under these
25  circumstances: an announcement of sufficiency based upon a decisional

1  document not revealed to the public, made without prior notice that the Secretary

2  would refuse to honor withdrawal requests past a certain date, which date was not

3  revealed, and made without prior notice of purported procedural requirements

4  that withdrawal requests would have to satisfy.  *Cf., State ex rel. Lang v. Furnish,*

5  48 Mont. 28, 134 P. 297 (1913) (board of county commissioners set a hearing

6  date to consider petition and counter-petitions supporting and opposing formation

7  of a new county).

8          25.    In addition, "final action" necessarily presupposes a final

9  decision by "the person or body created by law to determine the matter submitted

10  by the petition," so even if the Secretary were such person, the Secretary's choice

11  to shield the process, applicable procedural requirements, and decisional

12  documents from the public means that his decision cannot be a "final action" that

13  precludes the withdrawal requests submitted in this case from being honored.

14  "The public has the right to expect governmental agencies to afford such

15  reasonable opportunity for citizen participation in the operation of the agencies

16  prior to the final decision as may be provided by law."  Mont. Const. Art. II, § 8.

17  "No person shall be deprived of the right to examine documents or to observe the

18  deliberations of all public bodies or agencies of state government and its

19  subdivisions, except in cases in which the demand of individual privacy clearly

20  exceeds the merits of public disclosure."  Mont. Const. Art. II, § 9.

21          26.    These constitutional limits on the Secretary's power comport

22  with similar legal principles, like those codified in the Montana Administrative

23  Procedure Act, Sections 2-4-101 *et seq.*, MCA.  Under that statute, state agencies

24  must "make available for public inspection all rules and all other written

25  statements of policy or interpretations formulated, adopted, or used by the agency

1    in the discharge of its functions." Section 2-4-103(1)(a), MCA.  When an agency

2    fails to do so, it exceeds its authority, and its interpretations have no legal effect.

3    *See* Section 2-4-103(3), MCA ("No agency rule is valid or effective against any

4    person or party whose rights have been substantially prejudiced by an agency's

5    failure to comply with the public inspection requirement herein.").

6          27.    The Legislature has not granted the Secretary authority to

7    prescribe forms for withdrawing from political party qualification petitions.

8          28.    The Legislature has not granted the Secretary the authority

9    or directed him to certify, to the to the governor or otherwise, the results of a

10   political party qualification petition.

11         29.    The Legislature has not established a statutory deadline for

12   submitting requests to withdraw signatures from a political party qualification

13   petition.

14         30.    The Secretary has not properly adopted rules or public

15   policies to prescribe forms and requirements for withdrawing from political party

16   qualification petitions or established a deadline for submitting requests to

17   withdraw signatures from a political party qualification petition.

18         31.    Therefore, the Secretary's determinations of a cut-off date

19   for the withdrawal of signatures from the political party qualification petition and

20   of forms and requirements for withdrawing signatures from the petition in this

21   matter were without statutory authority and were arbitrary and capricious.

22         32.    Further, the withdrawal requests at issue are valid because

23   Plaintiffs and other petition signers withdrew after learning that representations

24   made to induce them to sign the petition were false.

25   /////

33. The identity of the group that sponsored and organized the petition—the MTGOP—was not revealed until well after signers signed the petition and the Secretary found that the signatures satisfied the requirements of the political party qualification statute.

34. Montana law provides that even after final action is taken on a petition, signers can still withdraw if they learn that representations made to them as an inducement to sign the petition, and on which they relied, were false. *See, Anderson*, 92 Mont. at 298, 13 P.2d at 231, 234.

35. To determine when a misrepresentation justifies a signatory's withdrawal, courts often apply general common law and statutory principles of contract and tort law. *See Anderson*, 13 P.2d at 234 (citing contract principles); *see also Nelson v. Morse*, 91 N.H. 177, 177 (1940) (drawing on principles of tort law to disqualify signatures obtained by deception) ("[F]raud lies in silence or concealment which constitutes dishonesty as well as in actual misrepresentations[.]").

36. Montana law provides for an independent statutory prohibition on the willful deception of another with the intent to induce that person to act. *See, e.g.*, Section 27-1-712(2)(c), MCA (describing deception as including "the suppression of a fact by one who is bound to disclose it or who gives information of other facts that are likely to mislead for want of communication of that fact"); *Dewey v. Stringer*, 2014 MT 136, ¶ 15, 375 Mont. 176, 182, 325 P.3d 1236, 1241.

37. The doctrine of negligent misrepresentation imposes liability on those who make untrue representations about material facts with the intent to

/////

1    induce reliance. *See Morrow v. Bank of Am., N.A.*, 2014 MT 117, ¶ 45, 375

2    Mont. 38, 52, 324 P.3d 1167, 1180 (citing *Kitchen Krafters v. Eastside Bank*, 242

3    Mont. 155, 165, 789 P.2d 567, 573 (1990)).

4            38.     The doctrine of constructive fraud provides both contractual

5    and damages remedies—including the right of rescission—for the breach of a

6    duty which, even without fraudulent intent, creates an advantage for the

7    breaching party by misleading another person to that person's prejudice. *See*

8    *Morrow*, ¶ 62; Section 28-2-406(1), MCA; *McGregor v. Mommer*, 220 Mont. 98,

9    109, 714 P.2d 536, 543 (1986) (noting that a material misrepresentation sufficient

10   to constitute constructive fraud that can lead to rescission of a contract may be

11   implicit, such as when a party "create[s] a false impression concerning . . .

12   important matters and subsequently fail to disclose the relevant facts").

13           39.     The doctrine of unilateral mistake justifies rescission of a

14   contract when one party has a "belief in the present existence of a thing material

15   to the contract which does not exist or in the past existence of such a thing which

16   has not existed," and the other party knew or suspected the mistake. *See E.H.*

17   *Oftedal & Sons, Inc. v. State ex rel. Mont. Transp. Comm'n, 2002 MT 1*, ¶ 47,

18   308 Mont. 50, 64-65, 40 P.3d 349, 358; Section 28-2-409(2), MCA.

19           40.     The actions taken by the MTGOP and their agents to induce

20   Montanans to sign the petition without disclosing their role in organizing and

21   sponsoring the petition closely track the elements of each of these doctrines, and

22   by analogy, justify the acceptance of withdrawal forms at issue in this case.

23           41.     The MTGOP and its agents failed to properly and timely

24   disclose its involvement in the petition in violation of Montana's campaign

25   finance rules, and only made such disclosure weeks after signers had signed the

1  petition and even after it was submitted to officials. *See* 27-1-712(2)(c), MCA

2  (deceit entails "the suppression of a fact by one who is bound to disclose it" or

3  "giving facts that are likely to mislead for want of communication"); *Morrow*, ¶

4  45 (negligent misrepresentation requiring an untrue representation made without

5  any reasonable ground for believing it to be true); *Dewey*, ¶ 9 (constructive fraud

6  requiring a false representation with knowledge of its falsity).

7          42.    These misrepresentations and failures to disclose mattered to

8  signers, who would not have signed the petition had they known who was

9  sponsoring and organizing it, and who took action to withdraw their signature

10  once they learned what had happened.

11          43.    The actions of the MTGOP and its agents demonstrate that

12  its misrepresentations and failures to disclose in violation of Montana campaign

13  finance law were intentionally designed to create an advantage for the MTGOP at

14  the expense of unwitting signers. The MTGOP's conduct regarding its disclosure

15  obligations—under a disclosure regime enacted in direct response to the very

16  same petitioning firm gathering signatures for the very same petition just two

17  years earlier—further demonstrates that these misrepresentations and failures to

18  disclose were designed to confer a strategic benefit.

19          44.    The Secretary's failure to give effect to Plaintiffs' and other

20  signers' withdrawal requests also violates Article II, Sections 6 and 7 of the

21  Montana Constitution as applied to the circumstances of this case because it

22  severely burdens Plaintiffs' and other signers' constitutional right to not associate

23  with a petition sponsored by a political party with which they do not want to be

24  associated.

25  /////

1
2
3
4
5
6
7
8

45.     Article II, Section 6 of the Montana Constitution provides that "[t]he people shall have the right peaceably to assemble, petition for redress or peaceably protest government action." Article II, Section 7 provides that "[n]o law shall be passed impairing the freedom of speech or expression." Like the First Amendment, these provisions protect "the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Dorn v. Bd. of Trs. of Billings Sch. Dist. No. 2*, 203 Mont. 136, 145, 661 P.2d 426, 431 (1983).

9
10
11
12
13
14
15

46.     Activities that involve associating to promote political preferences, like signing a petition, are protected conduct under the First Amendment. *See, e.g.*, *Clingman v. Beaver*, 544 U.S. 581, 586 (2005); *Filo Foods, LLC v. City of SeaTac*, 179 Wn. App. 401, 406, 319 P.3d 817, 819 (2014) (concluding that "an individual expresses a view on a political matter by signing an initiative petition," and "this expression of a view implicates the signer's First Amendment rights").

16
17
18
19
20
21
22
23
24
25

47.     Under Montana law, state action that burdens fundamental rights, like those protected by Sections 6 and 7 of Article II of the Montana Constitution, must be justified by a compelling state interest narrowly drawn. *See, e.g.*, *Montana Envtl. Info. Ctr. v. Dep't of Envtl. Quality*, 1999 MT 248, 63, 296 Mont. 207, 225, 988 P.2d 1236, 1246 (holding that strict scrutiny applies to statutes infringing the rights protected under Article II of the Montana Constitution); *State v. Lilburn,* 1993 ML 78, *4 (Mont. Dist. Ct. 1993) ("Significant interference with First Amendment rights may be allowed only if a compelling government interest is shown, and all such infringements will be subject to close judicial scrutiny.") (citation omitted).

1    48.    The right to associate is burdened not only when a law

2  harms a voter's ability "to associate in the electoral arena to enhance their

3  political effectiveness as a group," *Anderson v. Celebrezze*, 460 U.S. 780, 793

4  (1980), but also when a voter's "right not to associate" is harmed, *Cal.*

5  *Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) (emphasis added); *See also*

6  *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973) (finding First Amendment rights

7  burdened when a statute "'lock[ed]' the voter into his pre-existing party

8  affiliation for a substantial period of time").

9    49.    The Secretary's imposition of an arbitrary deadline for

10  withdrawal requests, set well before the MTGOP's involvement was revealed,

11  imposes a severe burden on Plaintiffs' associational rights in this case by

12  "locking in" their association—and the consequences that flow from such

13  association under statute—in support of a petition they no longer support, and a

14  political party with whom they do not want to affiliate and whose political

15  effectiveness they do not want to advance. *See Kusper*, 414 U.S. at 58 (holding

16  statute prohibiting voter from changing pre-existing party affiliation substantially

17  abridged her ability to associate effectively with the party of her choice).

18    50.    The severity of this burden imposed by the Secretary's

19  deadline and refusal to credit the withdrawal requests at issue in this case is

20  heightened by the fact that Plaintiffs' association was "locked in" before they had

21  any way to know that they were affiliating with, and advancing the interests of,

22  the MTGOP.

23    51.    The Secretary's refusal to give effect to Plaintiffs'

24  withdrawal requests in this case is not justified by any weighty state interest—

25  much less one narrowly tailored to advance a compelling state interest.

1    52.   No statute, regulation, or policy statement requires that

2    requests for withdrawal from political party qualification petitions contain the

3    requestor's signature, nor does any statute afford the Secretary the authority to

4    require signatures or prescribe what forms of signatures are sufficient.

5    53.   All that is required is that the requestor clearly express their

6    intent to withdraw by identifying the petition at issue. *See Ford v. Mitchell*, 103

7    Mont. 99, 61 P.2d 815, 822–23 (1936). The withdrawal forms at issue—which all

8    contain an unambiguous request to withdraw their petition signature, include the

9    requestor's name, address, and contact information, and include a signature

10   captured electronically through the DocuSign platform—easily satisfy this

11   requirement.[9]

12   54.   Assuming that it was necessary for a voter to provide a

13   signature in order to withdraw from a political party qualification petition, the

14   submission of withdrawal requests to the Secretary are not "transactions"

15   between the voter and the Secretary under the Montana Uniform Electronic

16   Transactions Act, Section 30-18-101, MCA (UETA) that require the Secretary's

17   consent to the use of electronic signatures. Withdrawing from a political party

18   qualification petition is a unilateral act by the voter, not a "transaction" between

19   the voter and the Secretary.

20   55.   Taking it one step further, if one assumes that political party

21   qualification petition withdrawals require a voter's signature and that such

22   withdrawals are "transactions" between the voter and the Secretary for purposes

23   of UETA, the context, surrounding circumstances, and the parties' conduct,

24   specifically the failure to the Secretary to promulgate or announce the deadline

25

---

[9] Section 13-10-601(2)(c), MCA, delegates to county election administrators the authority to verify signatures on political party qualification petition, like the process used for other ballot issues under §§ 13-27-303 through -306, MCA. The statute does not delegate to the Secretary any authority to verify signatures.

1   for withdrawals and that certain requests for withdrawal would not be accepted,

2   all demonstrate that the Secretary consented to receiving withdrawals from the

3   Green Party political party qualification petition through electronic means.

4   Accordingly, electronic signatures satisfy any purported signature requirement.

5   *See* §§ 30-18-105, -106, MCA.

6       56.   The Secretary's previously undisclosed opposition to the use

7   of electronic signatures would also impose an unconstitutional burden as applied

8   to the signers who, in the absence of contrary guidance from the Secretary,

9   electronically signed their withdrawal request in the middle of a global pandemic.

10  Failing to honor the withdrawal forms at issue here serves no state interest.

11  Courts and other institutions have consistently recognized the security and

12  validity of the DocuSign platform for electronic signatures across a wide variety

13  of contexts. The DocuSign platform used in this case collected the same

14  identifying information that would be collected by paper forms promulgated by

15  the Secretary for withdrawals from other kinds of petitions, and its security,

16  tracking, and its additional auditing features more than adequately serve any

17  interest in preventing and investigating fraudulent activity.

18      57.   As with the Secretary's adoption of a deadline for the

19  submission of withdrawal forms, the Secretary's adoption of a rule or policy

20  banning the submittal of electronic signatures was done without public input or

21  proper notice to the public. Mont. Const. Art. II, § 8. No statute grants the

22  Secretary the authority to adopt such a rule or policy. The Secretary has not

23  properly adopted such a rule or policy.

24  /////

25  /////

1   58.   The Secretary's adoption of a rule or policy barring
2   submittals of electronic signatures midway through this petition-gathering
3   process is arbitrary and capricious.

4   59.   When Plaintiffs' and other Montanans' valid and timely
5   withdrawal requests are given effect, the petition fails to meet the requirements of
6   Section 13-10-601(2), MCA. The statute requires that a political party
7   qualification petition contain: (1) an overall signature count of the lesser of "5%
8   or more of the total votes cast" for the last-elected governor, or 5,000 registered
9   voters; and (2) a threshold number of signatures for each state house district in at
10  least 34 districts. *See* Section 13-10-601(2)(b), MCA.

11  60.   After accounting for the valid withdrawal forms set out in
12  Plaintiffs' Exhibits 4 and 5, the Petition contains signatures above the thresholds
13  set by the political party qualification statute in no more than 33 House Districts,
14  as set forth in Plaintiffs' Exhibit 7.

15  Based on the foregoing findings of fact and conclusions of law, the
16  Court enters the following

17  **ORDER**

18  1.   The Secretary's motion for partial summary judgment on the
19  acceptance of electronic signatures is **DENIED**. MDP's cross-motion for
20  summary judgment regarding electronic signatures is **GRANTED**.

21  2.   The withdrawal requests are valid under Montana law;

22  3.   The Secretary's failure to accept and honor these withdrawal
23  requests violates Mont. Const. Art. II, §§ 6 and 7;

24  /////

25  /////

Findings of Fact, Conclusions of Law, and Order – page 48
DDV-2020-856

1          4.      The Petition fails to satisfy the requirements of section

2  13-10-601(2)(b), MCA; in that the petition does not satisfy the requirement that

3  the signatures come in sufficient numbers from at least 34 different legislative

4  House Districts; and

5          5.      The Secretary and all persons acting under his authority are

6  enjoined from implementing or giving any effect to the Petition.

7                    **MEMORANDUM**

8          It was presented to the Court that this is a unique situation, not

9  likely to re-occur. Indeed, Dana Corson, the Secretary's Election Director,

10  testified he had never encountered anything quite like the situation presented by

11  this case. Further, the statutes governing the qualifications for minor political

12  parties are new and untested, having been passed by the Legislature in 2019 and

13  becoming effective only on October 1, 2019. As the various entities involved in

14  these kinds of election processes become familiar with these statutes'

15  requirements, the kinds of difficulties encountered in this case might be avoided.

16          Nonetheless, the Court concludes that the Secretary's *ad hoc*

17  decision-making with regards to the petition defeats the purpose of these statutes.

18  The Secretary took steps not authorized by statute or regulation, made decisions

19  "on-the-fly" and without public input or knowledge as to the deadline and

20  process for withdrawing signatures from the petition, and made those decisions

21  based on documents not made public, even during this hearing. Such actions fly

22  in the face of well-established principles for open governmental action requiring

23  public participation and knowledge. The remedy for these actions is to set aside

24  the Secretary's decisions as set forth above.

25  /////

1    It was represented by the Secretary that he will be making

2    proposals to the next legislature about improvements and clarification to these

3    statutes.  The Court fully supports this effort.

4        DATED this 7 day of August 2020.

5

6

7                                        JAMES P. REYNOLDS

8                                        District Court Judge

9    cc:    Peter Michael Meloy, (via email to: mike@meloylawfirm.com)
            Mathew Gordon, (via email to: mgordon@perkinscoie.com)
10           Austin James, (via email to: Austin.james@mt.gov)
11           Matthew T. Meade, (via email to: matt@bigskylaw.com)

12   JPR/lm/DDV-2020-856  Montana Democratic Party, et al. v. State of Montana  -  Findings of Fact, Conclusions of Law, and Order.doc

13

14

15

16

17

18

19

20

21

22

23

24

25



Sign Up

Email or Phone

Password

Log In

Forgot account?

**Montana Green Party**
April 14 ·

Dear Voters,
This is to confirm, for those considering voting for the Green Party in the primaries, none of those running under the Montana Green Party ticket this season are actual Greens as far as we can tell. They have not been involved in Montana Green Party activities. Before voting for any of them, it would be wise to ask them to account for their belief in a platform, especially the Green Party requirement that we not take any corporate dollars.

https://mtgreenparty.org/…/ten-key-values-of-the-green-par…/

Yours truly,
Cheryl Wolfe,
Montana Green Party

MTGREENPARTY.ORG
**Ten Key Values of the Green Party**
1. Grassroots Democracy All human beings must be allowed a say in…

7 5 Comments 1 Share

Share

**Related Pages**

**Medicine Hat-Cardston-Warner G…**
Political Party

**Edmonton-Gold Bar Green Party**
Political Party

**The Humanity Project**
Nonprofit Organization

**Green Party of Pennsylvania**
Political Organization

**Calgary-Peigan Green Party**
Political Party

**Taber-Warner Green Party**
Political Party

**Bonnyville-Cold Lake-St. Paul Gr…**
Political Party

**Morinville-St. Albert Green Party**
Political Party

**Drawing Fire. America's Best Pol…**
Professional Service

**Iowa Green Party**
Political Party

**Montana Stonewall Democrats**
Political Organization

**Green Party of New Mexico**
Political Party

**Pages Liked by This Page**

**Thomas Breck for America 2022 …**

Green Party

Recent Post by Page

**See more of Montana Green Party on Facebook**

Log In or Create New Account

PLAINTIFF'S EXHIBIT 14

Exhibit B
Page 1 of 2

👍 3

↗ Share

**Montana Green Party**
Yesterday at 9:05 PM 🌐

🔁 Montana Greens, and Greens from the movement nationwide! We would l...
See More

2 Shares

↗ Share

**Montana Green Party**
May 29 at 8:15 AM 🌐

↗

😮❤️ 6        1 Comment 10 Shares

↗ Share

English (US) · Español ·
Português (Brasil) · Français (France) ·
Deutsch

＋

Privacy · Terms · Advertising · Ad Choices ▷·
Cookies · More ▾
Facebook © 2020

**See more of Montana Green Party on Facebook**

**Log In**        or        **Create New Account**

AUSTIN JAMES
Chief Legal Counsel
Secretary of State's Office
P.O. Box 202801
Helena, MT 59620-2801
406-444-2034
Austin.James@mt.gov

FILED

JUL  1 2020

ANGIE SPARKS, Clerk of District Court
By MARY M GOYINS Deputy Clerk

Matthew T. Meade
Smith Oblander & Meade, PC
P.O. Box 2685
Great Falls, MT 59403-2685
Telephone: (406) 453-8144
Matt@BigSkyLaw.com

COUNSEL FOR DEFENDANTS

## MONTANA FIRST JUDICIAL DISTRICT COURT
## LEWIS AND CLARK COUNTY

| | |
|---|---|
| MONTANA DEMOCRATIC PARTY, TAYLOR BLOSSOM, RYAN FILZ, MADELEINE NEUMEYER, and REBECCA WEED, individual electors, | Cause No. CDV-2020-856 |
| | Hon. Judge Reynolds |
| *Plaintiffs,* | |
| v. | **Defendant's Brief in Response to MTGOP's Motion to Intervene** |
| STATE OF MONTANA, by and through COREY STAPLETON, SECRETARY OF STATE, | |
| *Defendants.* | |

COMES NOW, Defendant, State of Montana, by and through the Secretary of State (Hereafter "The State", and respectfully submit this Brief in Response to MTGOP's Motion to Intervene, pursuant to Mont. R. Civ. P. 7 and 24. The undersigned reviewed the Motion, Brief, and proposed orders by MTGOP. The State does not have an objection and joins the sentiments expressed by the same.

The undersigned intends to demonstrate that the State followed the law.

The Democratic Party asks this Court to declare the State's actions were improper based on alleged conduct by the Republican Party. Such a disposal would be improper. However, the Rules of Civil Procedure provide a framework to properly dispose of actions with adequate representation as a party by those with interests at the heart of dispute. Clearly, the moving party has an "interest which would be affected by the declaration." UDJA, *see* MCA § 27-8-301. Mont. R. Civ. P. 24 (a)(1). UDJA requires allowing the moving party to participate. *Id.*

In addition,  the State would be unfairly prejudiced in this case if the State is required to defend against allegations unrelated to the statutory duties of the Secretary of State by a third-party, including, but not limited to, voluminous exhibits by Plaintiff that do not involve the named Defendant on behalf of the State whatsoever. The pending motion aids judicial economy and the interests of justice for your honor in disposing of this case expeditiously.

Finally, the undersigned respectfully submits for the Court's consideration the reasonableness of the proposed schedule contained within the proposed party filed in conjunction with this motion. While expedited, the timeline proposed by MTGOP facilitates a  fair, clean docket for the Court while maintaining a punctual schedule. As such, the State joins in support of granting MTGOP's Motion to Reschedule Hearing and Enter Scheduling Order.

Dated this __4__ day of July, 2020.

_____
Austin James
Chief Legal Counsel
Secretary of State's Office

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was delivered by email and US Postal mail to the following on July 1, 2020.

Peter Michael Meloy
MELOY LAW FIRM
P.O. Box 1241
Helena, MT 59624
(406) 442-8670
mike@meloylawfirm.com

Matthew Gordon
PERKINS COIE LLP
1201 Third Ave., Suite 4900
Seattle, WA 98101
(206) 359-8000
mgordon@perkinscoie.com

_____
Austin James

Anita Y. Milanovich
MILANOVICH LAW, PLLC
100 E Broadway St.
The Berkeley Room
Butte, Montana 59701
Ph.: 406/589-6856
Email: aymilanovich@milanovichlaw.com

Emily Jones
Talia G. Damrow
JONES LAW FIRM, PLLC
2101 Broadwater Ave.
Billings, MT 59104
Ph.: 406/384-7990
Email: emily@joneslawmt.com
        talia@joneslawmt.com

*Counsel for Proposed Intervenor MTGOP*

## Montana First Judicial District Court
## Lewis and Clark County

| | |
|---|---|
| **Montana Democratic Party,** *et al.***,** <br><br> *Plaintiffs,* <br><br> *v.* <br><br> **State of Montana, by and through its Secretary of State Corey Stapleton,** <br><br> *Defendant.* | **Civil Case No. CDV-2020-856** <br><br> **Reply Brief Supporting MTGOP's Motion to Intervene** |

On June 29, 2020, the Montana Republican Party ("MTGOP") moved to intervene in this matter because Plaintiffs have alleged that MTGOP engaged in "deceptive practices" to give the Green Party access to the ballot, warranting the Green Party's removal from the November 2020 general election ballot. (*See, e.g.,* Pls.' Resp. Defs' Mot. Dismiss or Vacate, Doc. 14, at 1.) On July 6, 2020, Plaintiffs filed their response. MTGOP now timely replies.

## ARGUMENT

### I. MTGOP Has A Statutory Right to Intervene.

Plaintiffs brought this action under the Uniform Declaratory Judgments Act ("UDJA") but do not address MTGOP's statutory right to intervene in this case under the UDJA. Because Plaintiffs allege MTGOP's apparent deceit justifies removing the Green Party from the ballot, (*see, e.g.,* Pls.' Resp. Defs.' Mot. Dismiss or Vacate, Doc. 14, at 1), MTGOP will inevitably be affected by any declaration issued by this Court—the Court will necessarily need to adjudicate whether any such alleged deceit occurred in order to accept or reject Plaintiffs' claim. *See Edmondson v. Nebraska*, 383 F.2d 123, 127 (8th Cir. 1967) (stating that a showing that a legal detriment flows from a finding of fraud could be the basis for mandatory intervention). So MTGOP is a necessary party statutorily authorized to intervene and should be allowed to present evidence and argument regarding MDP's claims of deceit, negligent misrepresentation, fraud, and constructive fraud. Mont. R. Civ. P. 24(a)(1). *See* MCA § 27-8-301 ("When declaratory relief is sought, all persons *shall* be made parties who have or claim *any* interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding.") (emphasis added).

### II. MTGOP's Interest Will Be Impaired Without Its Involvement.

MTGOP also satisfies Mont. R. Civ. P. 24(a)(2)'s criteria for intervention because its interest will be impaired without its participation. *See supra* Part I. Plaintiffs, however, contend that their claims solely relate to Defendant Secretary of State and whether his office complied with the statutory obligations of petition signature withdrawal. (Pls.' Resp. MTGOP Mot. Intervene at 1.)

**Reply Brief Supporting**
**MTGOP's Motion to Intervene**                    -2-

Plaintiffs' allegations of deception and fraud are just that—allegations. No direct evidence is provided in Plaintiffs' filings to substantiate their claims. For example, Plaintiffs asserts that the "mystery" of the "true identity" of who was behind funding the Green Party nomination petition wasn't timely revealed. (Pls.' Supp. Tr. Br. at 17, 18.) But MTGOP's campaign finance filings were properly and timely made. (*See* FEC Report, attached as Ex. A at 31 (reporting federal spending to the FEC in a timely February 2020 report); MTGOP COPP Report, attached as Ex. B, at 3 (reporting state spending to COPP in a timely March 2020 report); COPP Findings, attached as Ex. C, at 4[1] (stating that the March report was timely).) Plaintiffs state that petition signers were misled—"induced"—by petition signature gathers to believe that the Green Party was sponsoring the effort. (Pls.' Supp. Tr. Br. at 8, 18.) However, those collecting the signatures had no knowledge of who was funding the effort and made no assertions to signers regarding the source of that funding. (*See* Pope Aff., attached as Ex. E; Goldberg Aff., attached as Ex. F.) And Plaintiffs state that MTGOP tricked signers into signing the petition to "gain ballot access for fake 'Green Party' candidates." (Pls.' Resp. Defs.' Mot. Dismiss or Vacate, Doc. 14, at 1.) This is false. (*See* Marbut Aff., attached as Ex. G; Davis Aff., attached as Ex H; Fredrickson Article, attached as Ex. I.)

In short, Plaintiffs' filings are replete with unsupportable allegations of MTGOP's supposed fraud, and Plaintiffs have not withdrawn or amended their filings to remove those allegations. Plaintiffs' litigation position belies any claim here that MTGOP's interests are not implicated.

---

[1] COPP recently concluded that MTGOP failed to report federal spending for the petition in January on its timely-filed March COPP report. (COPP Findings, attached as Ex. C, at 9.) This is error as a matter of law. (*See* MTGOP Letter to COPP, attached as Ex. D.)

Exhibit D
Page 3 of 7

Plaintiffs also allege MTGOP's interest is purely reputational, the protection of which does not justify intervention. (Pls.' Resp. MTGOP Mot. Intervene at 5.)  However, as MTGOP states in its opening brief, Plaintiffs raise the propriety of MTGOP's conduct as a basis for disqualify the Green Party from ballot access, which is now subject to the Court's scrutiny— whether MTGOP engaged in wrongdoing may well form the basis for this Court's declaratory ruling in this matter. This is not just reputational; it is a legal adjudication, which Plaintiffs would have made without MTGOP's opportunity to be heard.

Contrary to MDP's claims, MTGOP is not afraid of the evidence in this case.  (Pls.' Resp. MTGOP Mot. Intervene at 5.)  MTGOP's evidence, described above and attached hereto, shows that neither it nor its contractor, Advanced Micro Targeting, Inc. ("AMT") engaged in any unlawful or wrongful conduct.  If the Court is to have an accurate picture of the circumstances surrounding the certification of the Green Party to the ballot, MTGOP's evidence should be allowed into the record, and not simply the one-sided, unsupportable allegations of MTGOP's political opponent.  This Court should have all the evidence, and MTGOP should be allowed to present that evidence to the Court.

So long as Plaintiffs' allegations of "deceptive practices" remain grounds for relief in this litigation, MTGOP has a legally recognized interest in this matter that is impaired without its involvement. Mont. R. Civ. P. 24(a)(2).

### III. MTGOP's Motion is Timely and Will Not Prejudice the Parties.

Plaintiffs contend that MTGOP's effort to intervene now is untimely, as this matter was initiated in early June. (Pls.' Resp. MTGOP Mot. Intervene at 5.) Given that Plaintiffs themselves waited several months before even initiating this action, this claim rings hollow.

Nevertheless, MTGOP moved to intervene when it became apparent that Plaintiffs'
allegations of misrepresentation and fraud formed a basis for the declaratory and injunctive relief
they seek and that the Court expected Defendant to defend MTGOP's actions, (*see* Hearing
Transcript, Pls.' Ex. A, at 9[2]). And it did so before anything substantive or dispositive
transpired—MTGOP's *Motion to Intervene* was filed before the deadline for the State's Answer
to the Complaint had even passed.

Neither the parties nor this case will not be prejudiced by MTGOP's intervention in the
case. Rather, the interests of justice will be served by having all available evidence at the
Court's disposal to make a ruling on this important case.

---

[2] At the June 22, 2020, hearing, Defendant expressed a neutral position on the conduct of
MTGOP when asked of the Court. (Hearing Trans., Pls' Ex. A, at 9:15-19). Defendant has no
legal obligation to defend MTGOP, and Plaintiffs cite none, (Pls.' Resp. Mot. Intervene at 8.)
*See State ex rel. Palmer v. Dist. Court,* 190 Mont. 185, 189 (1980) ("in determining adequacy of
representation under Rule 24(a), the court will look to see if there is a party charged by law with
representing [the absent party's] interest.") (internal citations omitted).

**Reply Brief Supporting**
**MTGOP's Motion to Intervene**                    -5-

## CONCLUSION

For the foregoing reasons, MTGOP respectfully moves that this Court grant its *Motion to Intervene*.

Dated: July 13, 2020

Respectfully submitted,

Anita Y. Milanovich
MILANOVICH LAW, PLLC
100 E Broadway St.
The Berkeley Room
Butte, Montana 59701
Ph.: 406/589-6856
Email: aymilanovich@milanovichlaw.com

Emily Jones
Talia G. Damrow
JONES LAW FIRM, PLLC
2101 Broadwater Ave.
Billings, MT 59104
Ph.: 406/384-7990
Email: emily@joneslawmt.com
        talia@joneslawmt.com

*Counsel for Proposed Intervenor MTGOP*

## Certificate of Service

I hereby certify that a copy of a true and correct copy of the foregoing document was

served on the following counsel of record in this matter on July 13, 2020, as follows:

Peter Michael Meloy
MELOY LAW FIRM
P.O. Box 1241
Helena, MT 59624
Ph. : (406) 442-8670
Email : Mike@meloylawfirm.com
Service: U.S. Mail

Matthew Gordon
PERKINS COIE LLP
1201 Third Ave., Suite 4900
Seattle, WA 98101
Ph.: (206) 359-8000
Email: mgordon@perkinscoie.com
Service: U.S. Mail

*Counsel for Plaintiffs*

Austin James
Chief Legal Counsel
Secretary of State's Office
P.O. Box 202801
Helena, MT 59620-2801
Ph.: 406-444-2034
Email: Austin.james@mt.gov
Service: Email (by consent)

Matthew T. Meade
Smith Oblander & Meade, PC
P.O. Box 2685
Great Falls, MT 59403-2685
Ph.: 406-453-8144
Email: matt@bigskylaw.com
Service: Email (by consent)

*Counsel for Defendant*

Anita Y. Milanovich

**Reply Brief Supporting
MTGOP's Motion to Intervene**                    -7-

**ROYAL AUBREY DAVIS**
Attorney at Law
1400 North Benton Avenue
**MAILING ADDRESS:**
P.O. Box 4673
Helena, Montana 59604
(406) 442-4909

Attorney *pro se*

MONTANA FIRST JUDICIAL DISTRICT COURT,
LEWIS AND CLARK COUNTY

<table>
<tr><td></td><td></td></tr>
<tr><td>MONTANA DEMOCRATIC PARTY.<br>TAYLOR BLOSSOM<br><br>and<br><br>TAYLOR BLOSSOM, RYAN FILZ,<br>MADELEINE NEUMEYER, and<br>REBECCA WEED, individual<br>electors,<br><br>      Plaintiffs<br>    vs.<br><br>STATE OF MONTANA, by and<br>through its SECRETARY OF STATE<br>COREY STAPLETON,<br><br>      Defendant.</td><td>Case No.  CDV-2020-856<br><br>Hon. James P. Reynolds<br><br><br><br><br>**AFFIDAVIT OF<br>ROYAL AUBREY DAVIS**</td></tr>
</table>

COMES NOW the Affiant, ROYAL AUBREY DAVIS, and being of lawful age and first duly sworn and upon his oath, deposes and says as follows:

1.   That the Affiant is a registered voter in Lewis and Clark County, Helena, Montana.

2.   That the Affiant has resided in the State of Montana, County of Lewis and Clark, City of Helena, for more than forty

Exhibit E
Page 1 of 5
**MTGOP Ex. H**

1    years prior to the commencement of the instant action.

2    3.    That the Affiant is a *bona fide*, Real Party In Interest

3    to the instant action, being a qualified candidate for the office

4    Of Montana Attorney General, on the Green Party ticket.

5    4.    That the Affiant was, prior to filing for the office of

6    Montana Attorney General on the Green Party, a staunch and life

7    time member of the Democratic Party, having gone with his father

8    at the age of 21 years, to register as such.  Further, the

9    Affiant was involved in three of Governor Tom Judge's elections,

10   twice as his Lewis and Clark County Campaign Coordinator.  The

11   Affiant was also involved in Chief Justice Mike McGrath's bid for

12   governor, and once for Governor Brian Schweitzer gubernatorial

13   win.

14   5.    That the Affiant still, supports many planks in the

15   Democratic Platform.

16   6.    The Affiant while having both Democratic and Republican

17   -- close and respected friends and acquaintances -- has

18   absolutely no ties to the Republican Party, financially,

19   emotionally or philosophically.

20   7.    That the Affiant owns residential, timber and

21   agricultural land in Montana.

22   8.    That the Affiant has collected wind generators since he

23   was in high school.  Additionally he has earned a living working

24   on them, and owns solar panels.

25   9.    The Affiant heats his home and mountain cabin,

26   exclusively with renewable resources.

27

28   **MONTANA DEMOCRATIC PARTY v. STATE OF MONTANA et al.**
     AFFIDAVIT OF ROYAL AUBREY DAVIS                    PAGE 2

1      10.   That the Affiant supports sustainable alternatives to
2 the large and wasteful program which has seized this country's
3 infrastructure.

4      11.   That the Affiant has taken absolutely no part in the
5 process of collection of signatures necessary for the
6 qualification of the Green Party for the Montana Ballot.   Further
7 the Affiant was not aware that the initiative had been successful
8 until a Democratic Party member, and close friend suggested that
9 he run for Attorney General.

10      12.   That the Affiant could well be harmed financially and
11 emotionally by this action, and as such is assuredly a *bona fide*
12 Real Party in Interest.

13      13.   That, in light of the above and foregoing, the Affiant
14 is contemplating entering this case as a Co-Defendant, or as a
15 Co-Defendant/Counter Plaintiff.

16      14.   Further Affiant sayeth not.

17      DATED this July 10, 2020.

18

19

                       ROYAL AUBREY DAVIS, Affiant

20

21 STATE OF MONTANA            )
                            : ss.
22 COUNTY OF LEWIS AND CLARK   )

23

     ROYAL AUBREY DAVIS, having identified himself to me, and
24 being first duly sworn and upon his oath, states that he is the
   Affiant named above, that he has read the foregoing Affidavit,
25 and knows the contents thereof and that the matters, facts, and
   things stated therein are true and accurate to the best of his
26 knowledge and belief.

27
**MONTANA DEMOCRATIC PARTY v. STATE OF MONTANA et al.**
28 AFFIDAVIT OF ROYAL AUBREY DAVIS         PAGE 3

1   SUBSCRIBED AND SWORN TO before me this the ___13ᵗʰ___ day of July,
    2020.

2

3                    LAURIE FROST           Notary Public, State of Montana
                NOTARY PUBLIC for the
                   State of Montana         Residing at Helena, Montana
4       SEAL        Residing at             My commission Expires___2-7-2022___
                East Helena, Montana
                My Commission Expires
5                 February 07, 2022

6                        CERTIFICATE OF SERVICE
          This is to certify that a true and correct copy of the
7   foregoing was served on the Defendant and Defendant's counsel by
    First Class Mail, prepaid, email, or by facsimile transmission or
8   hand delivery on the date first above written.

9   Peter Michael Meloy
    MELOY LAW FIRM
10  P.O. Box 1241
    Helena, MT 59624
11  *mike@meloylawfirm.com*

12
    Matthew Gordon
13  PERKINS COIE LLP
    1201 Third Ave., Suite 4900
14  Seattle, WA 98101
    CO-COUNSEL FOR PLAINTIFFS
15  *mgordon@perkinscoie.com*

16  Austin James
    Chief Legal Counsel
17  Secretary of State's Office
    P.O. Box 202801
18  Helena, MT 59620-2801
19  *austin.james@mt.gov*

20  Matthew T. Meade
    SMITH OBLANDER & MEADE, PC
21  P.O. Box 2685
    Great Falls, MT 59403-2685
22  CO-COUNSEL FOR DEFENDANT
23  *matt@bigskylaw.com*

24  Edward D. Greim (pro hac pending)
    GRAVES GARRETT, LLC
25  1100 Main Street, Suite 2700
    Kansas City, Missouri 64105
26  *edgreim@gravesgarrett.com*

27

    **MONTANA DEMOCRATIC PARTY v. STATE OF MONTANA et al.**
28  AFFIDAVIT OF ROYAL AUBREY DAVIS              PAGE  4

1

2    Chris J. Gallus
     GALLUS LAW
3    1423 Otter Rd.
     **Helena, Montana 59602**
4    Co-Counsel for Proposed Intervenors
     Lorrie Corette Campbell and Jill Loven
5    *chrisjgalluslaw@gmail.com*

6                                                      _____
                                                       Royal Aubrey Davis, Attorney At Law
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1

25

26

27   <u>**MONTANA DEMOCRATIC PARTY v. STATE OF MONTANA et al.**</u>

28   AFFIDAVIT OF ROYAL AUBREY DAVIS              PAGE 5

                                                       Exhibit E
                                                       Page 5 of 5

1

2

3

4

5

6

7

8            MONTANA FIRST JUDICIAL DISTRICT COURT, LEWIS & CLARK COUNTY

| | |
|---|---|
| 9    MONTANA     DEMOCRATIC     PARTY;<br>TAYLOR     BLOSSOM;     RYAN     FILZ;<br>10   MADELEINE NEUMEYER; and REBECCA<br>WEED,<br>11<br>                    Plaintiffs,<br>12<br>        v.<br>13<br>    STATE OF MONTANA, by and through its<br>14   SECRETARY     OF     STATE     COREY<br>STAPLETON,<br>15<br>                Defendant,<br>16<br>        and<br>17<br>    MONTANA   REPUBLICAN   PARTY   and<br>18   LORRIE CORETTE CAMPBELL and JILL<br>LOVEN,<br>19<br>                Proposed Intervenors. | Cause No.: DDV 2020–856<br>Judge: James P. Reynolds<br><br><br><br><br><br><br>**AFFIDAVIT OF GARY MARBUT** |

20      STATE OF MONTANA        )

21                                          :ss
        County of Missoula          )

22
              Gary Marbut states under oath:

23

24

25                          AFFIDAVIT OF GARY MARBUT
                                    PAGE 1 OF 5

1.    I am over 18 years old and I have personal knowledge of the facts stated in this Affidavit.

2.    I am a registered elector residing in Missoula County, Montana.

3.    I am in all ways qualified to be elected to and serve in the Montana Legislature.

4.    I am a filed Green Party candidate for Montana Senate District 47.

5.    I was uncontested for the Primary Election, so I am scheduled to be on the General Election ballot in November of 2020.

6.    I have no knowledge of and had no participation in the process of collecting signatures that resulted in Green Party ballot status.

7.    I have been a candidate for public office before on more than one occasion, running once on the Democrat Party ticket, running on the Republican Party ticket, and most recently running as an Independent (House District 94 in 2014). I have no great loyalty to any particular party, but currently find the Green Party to be a good philosophical fit for me and hopefully for Senate District electors.

8.    In good faith, I chose to run on the Green Party ticket because I have stellar "green" credentials to bring to this attempt at public service, to wit:

a)    Governor's appointment. In the 1980s I was appointed to a Governor's Advisory Council for Residential Energy Conservation.

b)    Energy conservation standards. I worked with the Northwest Power Planning Council to help them design their residential energy conservation standards.

c)    Eco software. I wrote and sold software to evaluate any home, existing or planned, for its energy consumption features and to analyze the payback for investment in energy conservation. This software was approved by Fannie Mae and Freddie Mac for use in lending for home construction.

d)    Converting excess forest biomass to green power. I designed and described a process to clean up our overburdened forests by converting excess forest biomass into electricity at the nearest power line to the cleanup project and to inject that

green power into the power grid for resale. This process would turn the bottom line of many forest cleanup projects from red to black, could employ a lot of forest workers, and would reduce the potential for catastrophic forest fires. It is carbon neutral and pollution free.

e)    Model solar home. I designed, built, and now live in what is one of the most energy efficient homes in Montana. I built this home 40 years ago. It is 2,400 square feet of space and is active thermal solar, electrical solar, organic solar, and passive solar. It is super insulated, an efficient shape, partially earth-sheltered, high thermal mass, and has special integration of systems with extensive monitoring. My hot water is mostly free. My electric backup heat costs about $10 per year. I built this custom home 40 years ago to be a model of energy efficiency. It was such a model then and still is now. It was featured in the Missoulian when built. When some people say they "built" a home, they mean they hired or paid the contractor. I mean that I cut the boards and drove the nails.

f)    Buying green power. Despite my home's lean energy design and function, I still buy some electricity from the utility company. For more than two decades, however, I have paid extra each month to source the electricity I do use from green, renewable sources. Anyone can do this; few choose to do so.

g)    All-electric transportation. When you see me driving, it will usually be an all-electric 2017 Fiat 500e ("EV") that I have owned since it had 4,500 miles on the odometer. I can charge this vehicle from my solar panels. If I charge it from the grid, I use green energy for which I pay the utility extra to obtain it from a renewable source.

h)    Action, not talk. During the episode last fall when some Montanans were carrying signs and protesting in the streets about fossil fuels and climate change, wanting government to just do something, I spent two months helping my son build and install a 15kW photovoltaic system – talk versus real action. I was actually on the roof bolting solar panels in place while others were protesting fossil fuel use. I believe in leading by example, not by mandate.

i)    Organic food production. For 40 years I have been an organic gardener. I have about 1/2 acre under active cultivation to grow the usual foods for consumption, plus I am experimenting with growing Quinoa in our Montana climate. This fits well with the national Green Party platform's goal of sustainable local agriculture for food production.

j)    Livestock. The livestock that graze my property are Alpacas. They are kept for their fiber, which is harvested at the annual, springtime shearing. Alpacas are gentle on the land and their fiber helps keep people warm.

1    9.    I believe that I have unique and very useful experience, credentials, knowledge,

2    background, and attitude to offer to and serve the electors of Senate District 47.

3    10.    I believe that a successful effort by the Democrat Party to remove Green Party

4    candidates from the ballot would disenfranchise me and be a substantial disservice to the electors

5    of Senate District 47 and to me personally.

6    11.    Further, I believe that I have a right to seek and hold public office under the United

7    States and Montana Constitutions, and that a successful effort by the Democrat Party to remove

8    the Green Party from the ballot would violate these rights.

9    12.    Finally, as Justice Louis Brandeis articulated in *Whitney v. California*, if one

10   dislikes certain speech (or political philosophy), the proper remedy is more speech, not enforced

11   silence.  Thus, if the Democrat Party dislikes the presence or philosophy of the Green Party, the

12   proper remedy is for the Democrat Party to speak more or even form yet another party, but not to

13   remove the Green Party from the ballot and thereby deny voters that opportunity.

14   DATED this ___9___ day of July, 2020.

15

16

17   GARY MARBUT

18   Subscribed and sworn to before me this ___9th___ day of July, 2020 by Gary Marbut.

19

20   **SABRINA GARCIA**
     **NOTARY PUBLIC for the**
     **State of Montana**
     **Residing at Lolo, Montana**
     **My Commission Expires**
     **February 07, 2021**

     Notary Public for the State of Montana

21

22   (S E A L)

23

24

25                    AFFIDAVIT OF GARY MARBUT          Exhibit F
                      PAGE 4 OF 5                       Page 4 of 5

1          **<u>CERTIFICATE OF SERVICE</u>**

2          I certify that on this _____ day of July, 2020, a true and correct copy of this document was
    sent via e-mail and U.S. mail to the following:

3
           Peter Michael Meloy
4          MELOY LAW FIRM
           P.O. Box 1241
5          Helena, MT 59624
           *mike@meloylawfirm.com*
6
           Matthew Gordon
7          PERKINS COIE LLP
           1201 Third Ave., Suite 4900
8          Seattle, WA 98101
           *mgordon@perkinscoie.com*
9                    CO-COUNSEL FOR PLAINTIFFS

10         Austin James
           Chief Legal Counsel
11         Secretary of State's Office
           P.O. Box 202801
12         Helena, MT 59620-2801
           *austin.james@mt.gov*
13
           Matthew T. Meade
14         SMITH OBLANDER & MEADE, PC
           P.O. Box 2685
15         Great Falls, MT 59403-2685
           *matt@bigskylaw.com*
16                   CO-COUNSEL FOR DEFENDANT

17         Edward D. Greim (pro hac pending)
           GRAVES GARRETT, LLC
18         1100 Main Street, Suite 2700
           Kansas City, Missouri 64105
19         *edgreim@gravesgarrett.com*

20         Chris J. Gallus
           GALLUS LAW
21         1423 Otter Rd.
           Helena, Montana 59602
22         *chrisjgalluslaw@gmail.com*
                     CO-COUNSEL FOR PROPOSED INTERVENORS
23                   LORRIE CORETTE CAMPBELL AND JILL LOVEN

                                         By:_____
24

25                         AFFIDAVIT OF GARY MARBUT                     Exhibit F
                                  PAGE 5 OF 5                          Page 5 of 5

Gary Marbut, candidate
Senate District 47
Green Party
P.O. Box 16106
Missoula, Montana 59808
Ph.:  406-549-1252
Email:  gary@marbut.com

*Pro se*

## Montana First Judicial District Court
## Lewis and Clark County

======================================================================

| |
|---|
| **Civil Case No. CDV-2020-856** |

Montana Democratic Party, et al.,

        *Plaintiffs,*

**State of Montana, by and through its Secretary Of State Corey Stapleton,**

        *Defendant.*

**Motion to Intervene of Gary Marbut**

======================================================================

    Pursuant to Mont. R. Civ. P. 7 and 24, Proposed Intervenor Gary Marbut ("Marbut") respectfully moves that this Court grant its Motion to Intervene.  In support of his motion, Marbut states as follows:

1.   Plaintiffs filed this action on June 1, 2020, pursuant to the Uniform Declaratory Judgments Act ("UDJA"). (Doc. 1.)

2.   Rule 24 of the Montana Rules of Civil Procedure allows anyone to timely intervene as a right who "is given an unconditional right to intervene by statute," Mont. R. Civ. P. 24(a)(l), or "claims an interest relating to the property or transaction which is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless the existing parties adequately represent that interest," Mont. R. Civ. P. 24(a)(2).

3.      As laid out more fully in the accompanying brief, Marbut meets these intervention criteria. Because Plaintiffs have recently alleged that Green Party candidates are "fake", because Marbut is a bona fide, filed, nominated Green Party candidate, and because Plaintiffs failed to include Marbut as a genuine party in interest, Marbut has an "interest which would be affected by the declaration," creating a statutory right as a necessary party to participate in these proceedings under the UDJA, see MCA § 27-8-301. Mont. R. Civ. P. 24(a)(l). Disposing of this matter without Marbut also impairs its ability to protect that interest. Mont. R. Civ. P. 24(a)(2).

4.      This motion is timely as can be having been given zero notice and as this litigation is at the pending stage, with no substantive motions yet filed or substantive hearings undertaken on merit. The parties will not be prejudiced by Marbut's intervention.

            WHEREFORE, Marbut respectfully moves that this Court grant his Motion to Intervene.


Dated:  July 17, 2020

                                                    Respectfully submitted,



                                                    _____
                                                    Gary Marbut, candidate
                                                    Senate District 47
                                                    Green Party
                                                    P.O. Box 16106
                                                    Missoula, Montana 59808
                                                    Ph.:  406-549-1252
                                                    Email:  gary@marbut.com
                                                    *Pro se, Proposed Intervenor*


**Marbut, Motion to Intervene**              **- 2 -**

**Certificate of Service**

I hereby certify that a copy of a true and correct copy of the foregoing document was served on the following counsel of record in this matter on July 17, 2020 as follows:

Peter Michael Meloy
MELOY LAW FIRM
P.O. Box 1241
Helena, MT 59624
Ph. : (406) 442-8670
Email: Mike@meloylawfirm.com
Service:  U.S. Mail

Matthew Gordon
PERKINS COIE LLP
1201 Third Ave., Suite 4900
Seattle, WA 98101
Ph.: (206) 359-8000
Email: mgordon@perkinscoie.com
Service:  U.S. Mail

Counsel for Plaintiffs


Austin James
Chief Legal Counsel Secretary of State's Office P.O. Box 202801
Helena, MT 59620-2801
Ph.: 406-444-2034
Email: Austin.james@mt.gov
Service:  U.S. Mail

Matthew T. Meade
Smith Oblander & Meade, PC P.O. Box 2685
Great Falls, MT 59403-2685
Ph.: 406-453-8144
Email: matt@bigskylaw.com
Service:  U.S. Mail

Counsel for Defendant


_____
Gary Marbut

Gary Marbut, candidate
Senate District 47
Green Party
P.O. Box 16106
Missoula, Montana 59808
Ph.: 406-549-1252
Email: gary@marbut.com

*Pro se*

<div align="center">

**Montana First Judicial District Court**
**Lewis and Clark County**

</div>

| | |
|---|---|
| Montana Democratic Party, et al., | **Civil Case No. CDV-2020-856** |
| *Plaintiffs,* | **Brief Supporting Gary Marbut's Motion to Intervene of** |
| **State of Montana, by and through its Secretary Of State Corey Stapleton,** | |
| *Defendant.* | |

Plaintiffs are seeking to remove duly nominated Green Party candidates from the November ballot. Intervenor Gary Marbut filed in March of 2020 as a candidate for the Green Party for Montana Senate District 47 (SD 47) and was nominated by the voters on June 2, 2020 (See Exhibit #1, Certificate of Nomination). It is too late under law for this election cycle for Marbut to file for SD 47 under the banner of a different party (March 9, 2020 -13-10-201, M.C.A.), and too late to collect and submit signatures to qualify as a minor party or Independent candidate (May 26, 2020 - 13-10-503, M.C.A.). The relief sought by Plaintiffs in this action would, if granted, result in the removal of Marbut from the ballot and the disenfranchisement of the primary election voters who put him there. Marbut therefore has a valid and significant interest in the outcome of this case warranting his participation as a party. This Court should grant Marbut's *Motion to Intervene.*

## ARGUMENT

Rule 24 of the Montana Rules of Civil Procedure allows anyone to timely intervene as a right who "is given an unconditional right to intervene by statute," Mont. R. Civ. P. 24(a)(1), or "claims an interest relating to the property or transaction which is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless the existing parties adequately represent that interest," Mont. R. Civ. P. 24(a)(2). A mere claim of interest does not create a right to intervene. DeVoe v. State 281 Mont. 356,363 (1997) (citing Aniballi v. Aniballi, 255 Mont. 384,386-87 (1992)). Instead, a party seeking to intervene must show a "direct, substantial, legally-protectable interest in the proceedings." In re C.C.L.B., 2001 MT 66,16.

Marbut meets these criteria.


### I. Marbut Has A Statutory Right to Intervene.

Plaintiffs have brought this action under the Uniform Declaratory Judgments Act ("UDJA"). (Doc. 1 at 85.) The UDJA in turn provides that any party that has an "interest which would be affected by the declaration" is a necessary party to a declaratory action. See MCA § 27-8-301 ("When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding.").

As a current and qualified Green Party candidate, Marbut clearly has a substantial interest in the arguments advanced in and the outcome of this action. Marbut will be inherently affected by any declaration this Court may issue to resolve this case. Marbut is a necessary party under the UDJA and so has a statutory right to intervene as required by Mont. R. Civ. P. 24(a)(l).

**Brief Supporting Marbut's Motion to Intervene   - 2 -**

## II. Marbut's Interest Will Be Impaired Without Its Involvement.

Disposing of this matter without Marbut also impairs his ability to protect his right to seek election to public office. Mont. R. Civ. P. 24(a)(2). Without Marbut's involvement in this case, Plaintiffs can continue to assert their allegations that Green Party candidates (including Marbut) are "fake" without rebuttal or correction. (See Exhibit #2, Affidavit of Gary Marbut.) Defendant understandably does not have any duty to vouch for Marbut and his qualifications. Nor can it, as a government agency, be expected to defend Marbut's goals or aspirations. Marbut is impaired without his participation in this case.

## III. Marbut's Motion is Timely and Will Not Prejudice the Parties.

Marbut has only recently learned of this litigation and its potential consequence of removing him from the November ballot. Marbut has filed his Motion to Intervene as promptly as circumstances have allowed. To the best of Marbut's understanding, no hearings or judicial actions have occurred concerning the merits of this case. And since this litigation is at the pleading stage, with only procedural motions pending before the Court, the parties will not be prejudiced by Marbut's intervention into the case. Further, Marbut provided the Exhibit #2 Affidavit to another party attempting to intervene, hoping that effort was the best and quickest way for Marbut to come to the attention of the Court in this case. However, that entity was unsuccessful in gaining intervenor status, requiring Marbut to immediately redirect and seek to intervene himself.

Marbut attaches hereto his proposed Answer. Mont. R. Civ. P. 24(c).

**Brief Supporting Marbut's Motion to Intervene    - 3 -**

## CONCLUSION

For the foregoing reasons, Marbut respectfully moves that this Court grant his Motion to Intervene.

Dated:  July 17, 2020

Respectfully submitted,

_____

Gary Marbut, candidate
Senate District 47
Green Party
P.O. Box 16106
Missoula, Montana 59808
Ph.:  406-549-1252
Email:  gary@marbut.com
*Pro se*

Exhibits

Certificate of Nomination
Affidavit of Gary Marbut
Answers to Complaint

**Brief Supporting Marbut's Motion to Intervene   - 4 -**

Certificate of Service

I hereby certify that a copy of a true and correct copy of the foregoing document was
served on the following counsel of record in this matter on June 29, 2020 as follows:
Peter Michael  Meloy MELOY LAW FIRM P.O. Box 1241
Helena, MT 59624
Ph. : (406) 442-8670
Email: Mike@meloylawfirm.com
Service: U.S. Mail

Matthew  Gordon
PERKINS COIE LLP
1201 Third Ave., Suite 4900
Seattle, WA 98101
Ph.: (206) 359-8000
Email: mgordon@perkinscoie.com
Service: U.S. Mail

Counsel for Plaintiffs


Austin  James
Chief Legal Counsel Secretary  of State's Office P.O. Box 202801
Helena, MT 59620-2801
Ph.: 406-444-2034
Email: Austin.james@mt.gov
Service: Email (by consent)

Matthew T. Meade
Smith Oblander & Meade, PC P.O. Box 2685
Great Falls, MT 59403-2685
Ph.: 406-453-8144
Email: matt@bigskylaw.com
Service: Email (by consent)

Counsel for Defendant



_____
Gary Marbut



**Brief Supporting Marbut's Motion to Intervene      - 5 -**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was served upon the following counsel of record by the means designated below this 13th day of August, 2020.

☑ U.S. Mail          Matthew G. Monforton
☑ Email              MONFORTON LAW OFFICES
☐ Hand-Delivery    32 Kelly Court
☐ Facsimile         Bozeman, MT 59718
☐ ECF                matthewmonforton@yahoo.com

                               *Counsel for Plaintiffs*

☐ U.S. Mail          Montana Secretary of State
☐ Email              Montana Capitol Building, Rm 260
☑ Hand-Delivery    Helena, MT 59620-2801
☐ Facsimile
☐ ECF

☑ U.S. Mail          Austin James
☑ Email              Chief Legal Counsel
☐ Hand-Delivery    Secretary of State's Office
☐ Facsimile         P.O. Box 202801
☐ ECF                Helena, MT 59620-2801
                         austin.james@mt.gov

                               *Counsel for Defendant Corey Stapleton*

☑ U.S. Mail          Timothy C. Fox, Montana Attorney General
☑ Email              c/o J. Stuart Segrest, Chief, Civil Bureau
☐ Hand-Delivery   c/o Aislinn W. Brown, Assistant Attorney General
☐ Facsimile        c/o Hannah E. Tokerud, Assistant Attorney General

☐ ECF               215 North Sanders
                     P.O. Box 201401
                     Helena, MT 59620-1401
                     ssegrest@mt.gov
                     aislinn.brown@mt.gov
                     hannah.tokerud@mt.gov

                     *Counsel for Montana Attorney General*

DATED:  August 13, 2020            By:*/s/ Peter M. Meloy*
                               Peter M. Meloy
                               MELOY LAW FIRM
                               P.O. Box 1241
                               Helena MT 59624
                               Telephone:  406.442.8670
                               Mike@meloylawfirm.com

                               Matthew P. Gordon
                               Kevin J. Hamilton, *pro hac vice* pending
                               PERKINS COIE LLP
                               1201 Third Avenue, Suite 4900
                               Seattle, WA 98101-3099
                               Telephone:  206.359.8000
                               Facsimile:   206.359.9000
                               MGordon@perkinscoie.com
                               KHamilton@perkinscoie.com

                               *Attorneys for Proposed Intervenor-*
                               *Defendants*