IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

|  |  |
|---|---|
| ROYAL DAVIS, GARY MARBUT, TOM HARSCH, and THERESA HARSCH, | CV 20–62–H–DLC |
| Plaintiffs, | ORDER |
| vs. |  |
| COREY STAPLETON, in his official capacity as Montana Secretary of State, |  |
| Defendant |  |
| And |  |
| MONTANA DEMOCRATIC PARTY, a Montana domestic nonprofit corporation, RYAN FILZ, MADELINE NEUMEYER, and REBECCA WEED, individual electors, |  |
| Intervenor-Defendants. |  |

This lawsuit, filed on August 11, 2020, alleges a violation of voters' and political candidates' federal due process rights. Plaintiffs comprise two candidates for state office, Royal Davis and Gary Marbut, and two voters, Tom Harsch and

–1–

Theresa Harsch.  Davis and Marbut are running as Green Party candidates[1] for the offices of, respectively, Montana Attorney General and State Senator.  Tom Harsch and Theresa Harsch are voters who cast ballots in the 2020 Montana Green Party primary.  (Doc. 1 at 2.)

Plaintiffs also filed a motion for a preliminary injunction and temporary restraining order on August 11, 2020.  (Doc. 4.)  They seek relief on or before August 20, 2020, the date by which Defendant, Montana Secretary of State Corey Stapleton, must certify ballots for the 2020 general election.  Secretary Stapleton does not express an opinion as to the relief sought by Plaintiffs, stating only that he "will fully comply with the ultimate [judgment] of this court regarding the merits of this case."  (Doc. 15 at 4.)

The Montana Democratic Party and voters Ryan Filz, Madeline Neumeyer, and Rebecca Weed moved to intervene in this lawsuit (Doc. 8), and the Court granted their motion (Doc. 11).  Filz, Neumeyer, and Weed signed a petition to qualify Green Party candidates for the 2020 general ballot, but they later moved to

---

[1] As detailed elsewhere in this Order, the legitimacy of Davis's and Marbut's Green Party affiliation is disputed.  The Court notes that it does not believe Davis and Marbut sought candidacy in bad faith, although it appears to be undisputed that the Montana Green Party does not recognize either candidate as a member or provide an endorsement.  *See infra* p. 6–8.

withdraw their signatures.  (Doc. 9 at 14, 16.)  Intervenor-Defendants vigorously

oppose the relief sought by Plaintiffs.  (Doc. 16.)

The Montana Republican Party ("MTGOP") has filed an amicus brief in

support of Plaintiffs.  (Docs. 12-1, 13.)  The Court addresses its arguments where

helpful throughout this Order.

The Court denies Plaintiffs' motion, finding that Plaintiffs are not entitled to

the "extraordinary remedy" of a preliminary injunction or temporary restraining

order.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).

BACKGROUND[2]

## I.    Legal Background

The Green Party has not "had a candidate for statewide office in either of the

last two general elections who received a total vote that was 5% of more of the

total votes cast for the most recent successful candidate for governor."   Mont.

Code Ann. § 13-10-601(1).  Accordingly, it did not automatically have the option

to "nominate its candidates for public office . . . by a primary election" for the

2020 general election ballot.

---

[2] Because this matter is proceeding on a highly expedited schedule, the Court is unable to decide this matter on a full record.  It generally relies on the state district court's factual findings in *Montana Democratic Party v. Montana*, No. DDV-2020-856 (Aug. 7, 2020 Mont. 1st Jud. Dist. Court, Lewis & Clark Cty.), but it has made best efforts to clarify when facts are legitimately in dispute in the parallel state court proceeding.  Most notably, the Court does not adopt any finding that the MTGOP violated state campaign finance law or engaged in fraud.

Under Montana law, the Green Party could nonetheless qualify for access to the general ballot "by presenting a petition . . . requesting the primary election." Mont. Code Ann. § 13-10-601(2)(a).  To succeed,

> The petition must be signed by a number of registered voters equal to 5% or more of the total votes cast for the successful candidate for governor at the last general election or 5,000 electors, whichever is less. The number must include the registered voters in more than one-third of the legislative districts equal to 5% or more of the total votes cast for the successful candidate for governor at the last general election in those districts or 150 electors in those districts, whichever is less.

Mont. Code Ann. § 13-10-601(2)(b).  Montana has 100 legislative districts, and so the petition was required to include both: (1) 5,000 or more signatures[3]; and (2) a sufficient number of signatures in at least 34 districts, the minimum number required to meet the threshold of "more than one-third of the legislative districts." Mont. Code Ann. § 13-10-601(2)(b).  (Doc. 1-4 at 5.)  There is no statute setting forth a procedure by which signers may withdraw their signatures.  (Doc. 1-4 at 14–15.)

## II.     The State Court Proceeding

Intervenor-Defendants sued Secretary Stapleton in state court on June 1, 2020, just prior to the primary election, seeking to block Green Party candidates

---

[3] The successful candidate for governor in 2016, Steve Bullock, received 255,933 votes.  Mont. Sec'y of State, *Official Election Results*, https://sosmt.gov/elections/results/.  Five percent of the votes received therefore is significantly greater than 5,000.

from appearing on the ballot.  (Doc. 1-4.)  Plaintiffs were not parties to that matter; although Plaintiff Gary Marbut filed a pro se motion to intervene, the motion was denied as untimely.  (Docs. 9 at 110–12 & 12-2 at 58–59.)

The state district court held a two-day evidentiary hearing in mid-July. (Doc. 1-4 at 4.)  On August 7, 2020, the court entered its findings of fact and conclusions of law.  It ordered that Secretary Stapleton must give effect to the signature withdrawal requests.  (Doc. 1-4 at 49.)  With the signatures withdrawn, the district court concluded that "the petition does not satisfy the requirement that the signatures come in sufficient numbers from at least 34 different legislative House Districts."  (Doc. 1-4 at 49.)  Thus, absent injunctive relief from this Court or a reversal by the Montana Supreme Court, the Green Party will not appear on the 2020 general ballot.

Secretary Stapleton immediately appealed the district court order, and his appeal is currently pending before the Montana Supreme Court, *Mont. Democratic Party v. Stapleton*, No. DA 20-396 (filed Aug. 7, 2020).  That appeal is proceeding on an expedited briefing schedule parallel to that which has been set by this Court. Order, *Mont. Democratic Party v. Stapleton*, No. DA 20-0396 (Aug. 11, 2020).

### III.    Factual & Procedural Background

The Green Party did not make an organized attempt to gain ballot access for the 2020 general election.  (Doc. 1-4 at 7.)  However, someone else did.  (Doc. 1-4 at 5–6.)  Advanced Micro Targeting, a Texas-based petition signature gathering firm, hired and paid individuals to gather signatures in support of ballot access; these individuals began canvassing the state in early 2020.  (Doc. 1-4 at 5–6.)  At the time, the public was unaware of who was paying for the drive.  (Doc. 1-4 at 5–7, 11.)

The petition was successful, and nearly all of the signatures eventually turned in were collected by mid-February.  (Doc. 1-4 at 6.)  However, funding for the petition remained unknown.  (Doc. 1-4 at 6.)  The Montana Green Party attempted, through its Facebook page, to notify members that it had taken no part in the effort, posting:

> We have been receiving notice that there are people falsely collecting information on behalf of the Green Party.  As of the moment, we are still in a legal battle[4] against the state of MT, and in such a state are not collecting, nor have we hired or asked for volunteers to collect information this 2020 cycle. . .  As of now, we have no house senate or state office candidates running for the 2020 election, at least until the

---

[4] The Court assumes that the reference to a "legal battle" pertains to a lawsuit filed in the District of Montana, *Montana Green Party v. Stapleton*, ___ F. Supp. 3d ___, 2020 WL 1316816 (D. Mont. March 20, 2020).  In that case, which is now on appeal to the Ninth Circuit, the Montana Green Party alleged that the petition-gathering statutory scheme unconstitutionally bars access to the ballot.  The district court rejected the argument, granting summary judgment to the state.

–6–

lawsuit reaches resolution.  Any individual acting in rude or suspicious behavior claiming to be collecting information on our behalf is not affiliated with our name and mission.

(Doc. 1-4 at 6–7 (ellipses in original).)  As a local journalist said on the radio on February 21, "[I]n the realm of shenanigans, some unknown group has gathered signatures and collected petitions around the state to qualify the Green Party for the ballot, a move that is seen as possibly helping Republican candidates. . . . [W]ho is it?"  (Doc. 1-4 at 8.)

Secretary Stapleton certified the petition on March 6, 2020, finding that it met the requirements of Montana Code Annotated § 13-10-601.  It was not until two and a half weeks later, on March 24, 2020, that journalists were able to follow the money trail.  (Doc. 1-4 at 18.)  The MTGOP had paid for the signature drive, in part through a shell group named "Montanans for Conservation," funded solely by the MTGOP.   (Doc. 1-4 at 18–20.)[5]  The MTGOP had contracted with Advanced

---

[5] The MTGOP disputes any suggestion that the difficulty in determining who funded the drive was attributable in part to noncompliance with Montana election law.  (Doc. 12-1.)  The Court expresses no opinion on this issue, although it notes that the campaign finance law allegedly arose from a 2018 signature drive with marked factual similarities to that which gave rise to this proceeding.  *See Larson v. Montana ex rel. Stapleton*, 434 P.3d 241 (2019).  In 2018, the Green Party was able to round up only approximately 700 signatures in support of access to the 2018 general ballot, but Advanced Micro Targeting collected an additional 9,461.  *Id.* at 248.  It was unclear then, too, who paid Advanced Micro Targeting.  As a result, the Montana Legislature passed SB 363 in 2019, adding reporting, disclosure, and registration requirements for entities spending money to qualify minor parties for ballot access.  Mont. Code Ann. §§ 13-37-601 through 13-37-607.

Micro Targeting, a Texas-based petition signature gathering firm, to send paid signature gatherers throughout Montana.  (Doc. 1-4 at 18–20.)

After learning what had occurred, The Montana Democratic Party made efforts to notify petition-signers of the MTGOP's involvement in the drive and to assist interested signers in withdrawing their signatures.  (Doc. 1-4 at 20–24.)  562 petition-signers submitted requests for withdrawal prior to the primary election, but Secretary Stapleton did not honor all of the requests.  (Doc. 1-4 at 25, 30.)

The Montana Green Party disclaimed the candidates running under its banner, posting an update to its Facebook page:

> This is to confirm, for those considering voting for the Green Party in the primaries, none of those running under the Montana Green Party ticket this season are actual Greens as far as we can tell.  They have not been involved in Montana Green Party activities.  Before voting for any of them, it would be wise to ask them to account for their belief in a platform, especially the Green Party requirement that we not take any corporate dollars.

(Doc. 9 at 88.)  Ultimately, Green Party primary ballots were mailed[6] to voters,[7] and approximately 800 were returned.  (Doc. 1 at 4.)

---

[6] Montana held an all-mail primary on June 2, 2020.  *See* Eric Dietrich, *Counties Will Have Option to Conduct All-mail Elections in November*, August 6, 2020.  Montana holds open primaries; all primary ballots are offered to each voter, regardless of the voter's registration status.  The voter must select which ballot to complete, as she may return only one party's ballot.  *See Ravalli Cty. Republican Cent. Comm. v. McCulloch*, 154 F. Supp. 3d 1063, 1065 (D. Mont. 2015).

[7] Montana law requires the Secretary of State to determine whether a primary is necessary, dependent upon the number of individuals who declare as candidates.  Mont. Code Ann. § 13-10-

### JURISDICTION

Plaintiffs argue that, because it brought suit under 42 U.S.C. § 1983, "this Court has jurisdiction notwithstanding the general prohibition contained in the Anti-Injunction Act, 28 U.S.C. § 2283, against federal injunctions staying proceedings in state courts," citing *Mitchum v. Foster*, 407 U.S. 225, 243 (1972). (Doc. 4 at 11).  The Court is reluctant to exercise jurisdiction while the appeal of the state court order is pending before the Montana Supreme Court.  For one thing, the Montana Supreme Court could, at any time, issue a ruling mooting this controversy.  And, for another, this Court's decision could disrupt a matter of significant importance to the State.  However, the Court's reluctance does not override jurisdiction.

Intervenor-Defendants argue that the Court lacks jurisdiction under *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106 (1984). *Pennhurst*, grounded in the Eleventh Amendment, provides that federal courts may not "instruct[] state officials on how to conform their conduct to state law."  *Id.*

*Pennhurst* does not bar jurisdiction in this matter.  Plaintiffs allege that, by operation of the state court order entered August 7, 2020, their federal

---

209.  Because two candidates declared for the U.S. Senate race, the determination was made that a Green Party primary was necessary.  *Id.*

constitutional rights will be violated.  The Court has not been called on to interpret state law or to tell Secretary Stapleton how to fulfill his official role; it is asked only to determine whether the Constitution will be violated if Secretary Stapleton complies with the district court order currently in effect (and, of course, with which Intervenor-Defendants agree).  The pending appeal of that ruling to the Montana Supreme Court certainly adds a procedural wrinkle.  But it does not alter that Plaintiffs ask the Court to "vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States,'" not to order Secretary Stapleton to appropriately fulfill his duties under state law.  *Pennhurst State Sch. Hosp.*, 465 U.S. at 105 (quoting *Ex parte Young*, 209 U.S. 123, 160 (1908)).  Whether Plaintiffs have actually alleged an infringement of a federal constitutional right is a separate question, and it is analyzed under the first *Winter* factor below.

## ABSTENTION

Intervenor-Defendants next argue that, even if this Court may exercise jurisdiction, it should nonetheless abstain under the *Pullman* doctrine.  "The reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court."  *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941).  Abstention is therefore appropriate "[w]here there is an action pending in state court that will likely resolve the state-

law questions underlying the federal claim." *Harris Cty. Comm'rs Ct. v. Moore*, 420 U.S. 77, 83 (1975). "*Pullman* abstention does not exist for the benefit of either of the parties but rather for 'the rightful independence of the state governments and for the smooth working of the federal judiciary." *San Remo Hotel v. City & County of S.F.*, 145 F.3d 1095, 1105 (quoting *Pullman*, 312 U.S. at 501).

"*Pullman* abstention is appropriate only when three concurrent criteria are satisfied: (1) the federal plaintiff's complaint must require resolution of a sensitive question of federal constitutional law; (2) that question must be susceptible to being mooted or narrowed by a definitive ruling on state law issues; and (3) the possibly determinative state law must be unclear." *United States v. Morros*, 268 F.3d 695, 703–74 (9th Cir. 2001). "Because the federal courts' obligation to adjudicate claims within their jurisdiction is 'virtually unflagging,' abstention is permissible only in a few 'carefully defined' situations with set requirements." *Id.* at 703.

The Court agrees that the principle of comity underlying the *Pullman* doctrine supports abstention, but it nonetheless finds that *Pullman* is not a perfect fit. First, the Court assumes without deciding that the complaint raises "a sensitive question of federal constitutional law," even though—as addressed below under

-11-

the first *Winter* factor—that question is unlikely to be resolved in Plaintiffs' favor. *Id.*

Second, this proceeding *could* be mooted by a ruling by the Montana Supreme Court. However, there is also a current, operative ruling on the state law issues. Further, there is no guarantee (although there is every indication) that the appeal will be decided prior to August 20, 2020, on which date Plaintiffs' constitutional rights will allegedly be irrevocably infringed. And, in the event that the Montana Supreme Court affirms the district court—which, of course, Intervenor-Defendants hope comes to pass—this controversy will remain very much alive, and the deadline for ballot certification will remain in place.

Third, the "possibly determinative state law [is not] unclear." *Id.* The trial court ruling currently is in effect and will remain so unless and until the Montana Supreme Court issues a reversal or vacatur.

The Court notes that it would be somewhat more inclined to abstain if the *Winter* factors were indifferent to the principles of comity that counsel in favor of abstention. But, because *Winter* demands consideration of the equities and the public interest, the test is expansive enough to allow for a full consideration of the Court's appropriate role in our federalist system. Given the procedural posture of this just-filed case, the Court's denial of Plaintiffs' motion for emergency

-12-

injunctive relief is not meaningfully different from a decision to abstain.  Thus, the Court will consider whether Plaintiffs are entitled to the relief sought.

## LEGAL STANDARD

Whether a plaintiff seeks a temporary restraining order or preliminary injunction, the standard is the same.  *Stuhlbarg Intern. Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  The plaintiff must show: (1) "that he is likely to succeed on the merits"; (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "that the balance of equities tips in his favor"; and (4) "that an injunction is in the public interest."  *Winter*, 555 U.S. at 20. Under Ninth Circuit law, "a stronger showing of one element may offset a weaker showing of another." *HiQ Labs, Inc. v. Linkedin Corp.*, 938 F.3d 985, 992 (9th Cir. 2019) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).  "So, when the balance of equities tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious questions going to the merits.'"  *Id.* (quoting *Cottrell*, 632 F.3d at 1131).

## I.    Likelihood of Success on the Merits

Plaintiffs allege that the relief ordered by the state district court on August 7, 2020 violates their Fourteenth Amendment right to substantive due process because the election was "conducted in a manner that is fundamentally unfair."

–13–

*Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1988).  The Fourteenth

Amendment guarantees that "[n]o state shall . . . deprive any person of life, liberty,

or property, without due process of law."  U.S. Const. amend. XIV.  Intervenor-

Defendants attack Plaintiffs' claim at its foundation, arguing that Plaintiffs have

failed to allege a violation of their Fourteenth Amendment rights.  The Court is not

unsympathetic to this argument, but in the interest of a full consideration of

Plaintiffs' motion, it addresses whether Plaintiffs are likely to succeed on their

claim that a failure to place Green Party candidates on the general ballot would be

"fundamentally unfair."  *Bennett*, 140 F.3d at 1226.

    *Bennett* provides a framework by which an election or procedure may be

declared invalid; "a court will strike down an election on substantive due process

grounds if two elements are present: (1) likely reliance by voters on an established

election procedure and/or official pronouncements about what the procedure will

be in the coming election; and (2) significant disenfranchisement that results from

a change in the election procedures."  *Id.* at 1226–27.  Plaintiffs argue that they

relied on Montana's petition process and that a "significant disenfranchisement"

will result if the candidates selected in the Green Party primary are not placed on

the general ballot.  The Court disagrees on both points.

Under the first *Bennett* prong, the question is whether there is an "unforeseeable departure from past election practices"—an "unfair" "surprise." *Id.* at 1225–26. Here, there was no such departure because Montana voters did not "rel[y] on an established election procedure." *Id.* at 1226. Before this case, there was no clear procedure by which signers supporting ballot access could withdraw their signatures, likely because there was no precedent for a situation in which signers would seek to withdraw their signatures *en masse*.[8] Voters did not reasonably rely on the absence of a procedure for signature withdrawal as decisive proof that signatures cannot be withdrawn.

Nor, even if there had been "reliance" and "a change in the election procedures," would the Court find anything approaching "significant disenfranchisement" here. *Id.* at 1226–27. "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). Candidates do not have an absolute right to appear on a ballot. *See Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983) ("The State has the

---

[8] Relevant to the state court proceeding, but not here, are questions regarding whether Secretary Stapleton imposed the wrong standards on potential withdrawers, including his obligation to accept signatures verified by DocuSign during a pandemic. It would be improper for the Court to weigh in on any such questions under *Pennhurst*, *see supra* p. 9, and the Court addresses only whether Secretary Stapleton, in complying with the state court ruling, will violate voters' Fourteenth Amendment rights.

undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot.")  And voters do not have an "absolute right to support a specific candidate regardless of whether he or she has satisfied reasonable eligibility requirements."  *Stiles v. Blunt*, 912 F.2d 260, 266 (8th Cir. 1990); *see also Rosario v. Rockefeller*, 410 U.S. 752 (1973) (upholding state law limiting right to participate in primary to those who meet deadline).

The due process clause is unconcerned with "garden variety election irregularities."  *Bennett*, 140 F.3d at 1226.  At the very most, that is what Plaintiffs have suffered; this case does not present "the long-odds exception to the rule of nonintervention."  *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 75–76 (1st Cir. 2001); *see also League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008) ("The Due Process Clause is implicated, and § 1983 relief is appropriate, in the exceptional case where a state's voting system is fundamentally unfair.").

For its part, Amicus MTGOP argues that the Court must apply strict scrutiny because the state court's action threatens the fundamental right to vote.  (Doc. 12-1 at 3–4.)  However, they cite to nothing which suggests that a party need only allege a violation of voting rights to get to strict scrutiny.  And such a rule would

immediately call into doubt any number of state election schemes, not to mention decades of settled precedent.

MTGOP further contends that the state district court ruling violates the federal constitution because that court denied its motion to intervene.  Whether the state court erred in denying MTGOP's motion to intervene is a matter for the Montana Supreme Court to suss out; the federal court is generally indifferent to a state court's administration of its own docket.

Plaintiffs have not shown a likelihood of success on the merits, defeating their motion.  The Court nonetheless addresses the remaining *Winter* factors.

## II.    Likelihood of Irreparable Harm

"[U]nlike monetary injuries, constitutional violations cannot be adequately remedied through damages."  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009.  "[O]nce [an] election occurs, there can be no do-over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F. 3d 224, 247 (4th Cir. 2014).  Because both sides of this litigation have significant interests at stake, the Court finds that both face potential irreparable harm.

Certification must take place on August 20, 2020.  When the ballots are certified, the Green Party candidates will either appear on the ballot or not.  If they do, then petition signers who moved to withdraw their signatures will see their

withdrawal requests go unhonored, and the Democratic Party and its voters may see votes for Democratic candidates siphoned by seemingly progressive candidates who would not be on the ballot but for the efforts of the MTGOP.  On the other hand, if the Green Party candidates are not there, approximately 800 Montanans who voted in the primary will have missed the opportunity to vote in another party's primary.

The Court finds that Plaintiffs have demonstrated a likelihood of irreparable harm.  It notes, though, that the Court could not issue injunctive relief without causing equivalent harm to Intervenor-Defendants.

### III.    Balance of the Equities

Plaintiffs contend that the balance of equities "tips sharply" in their favor. They argue that they and other voters face disenfranchisement, but that "[t]he State . . . will suffer no prejudice if relief is granted because it has no legitimate interest in disenfranchising an entire class of voters who lawfully cast their ballots."  (Doc. 4 at 17.)  But it hardly needs saying that "disenfranchisement" is not a legitimate interest.

Rather, the Court finds that the balance of equities counsels heavily against granting injunctive relief.  It is not that equitable considerations necessarily favor

Intervenor-Defendants, it is that they support refusing to interfere with the state's administration of its own election laws.

Further, Plaintiffs cannot rightly contend that the equities support their position when they chose not to attempt intervention in the state court matter and instead waited until the final hour to raise their constitutional claims. "A party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (per curium). "That is as true in election law cases as elsewhere." *Id.*

### IV.    Public Interest

The public interest also weighs against Plaintiffs' request for emergency relief. "While . . . federal courts have a duty to ensure that national, state and local elections conform to constitutional standards, [they must] undertake that duty with a clear-eyed and pragmatic sense of the special dangers of excessive judicial interference with the electoral process." *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1182–83 (9th Cir. 1988). Here, there is an overwhelming public interest in allowing the state judiciary and legislature to function without unnecessary federal intervention.

Although the Court has determined that none of the abstention doctrines are precisely on point, the principle of comity weighs heavily against granting

–19–

Plaintiffs' motion.  Ours "is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States."  *Younger v. Harris*, 401 U.S. 37, 44 (1971).  Where necessary, "[f]ederal courts, exercising a wise discretion, [must] restrain their authority because of scrupulous regard for the rightful independence of the state governments and for the smooth working of the federal judiciary." *Burford v. Sun Oil Co.*, 319 U.S. 315, 332 (1943) (quoting *Pullman*, 312 U.S. at 501) (internal quotation marks omitted).

"[T]he normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions."  *Younger*, 401 U.S. at 45.  Even if the merits favored Plaintiffs—and they do not—an injunction would nonetheless be inappropriate, given the parallel proceeding before the Montana Supreme Court.

Accordingly, IT IS ORDERED that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 3) is DENIED.

IT IS FURTHER ORDERED that the parties shall file notices apprising the Court of whether a case or controversy remains in this matter on or before August 21, 2020.

IT IS FURTHER ORDERED that the Clerk of Court shall immediately send an electronic copy of this Order to the Clerk of the Montana Supreme Court.

DATED this 19th day of August, 2020.

Dana L. Christensen, District Judge
United States District Court